ESTATE OF ERVIN A. REINKE, DECEASED, MARION REINKE, PERSONAL REPRESENTATIVE, AND MARION REINKE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Reinke v. Commissioner
Docket No. 7228-91
United States Tax Court
T.C. Memo 1993-197; 1993 Tax Ct. Memo LEXIS 197; 65 T.C.M. (CCH) 2570; May 4, 1993, Filed *197 Decision will be entered under Rule 155. For petitioners: Roland A. Suess. For respondent: Jay M. Erickson. TANNENWALD
TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge; Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Additions To Tax
Year
Deficiency
[1] Sec. 6661 1985
$ 33,367.07
$ 8,432.00
1986
61,817.45
15,454.00
1987
16,904.90
4,226.00
After concessions, the main issue for decision is whether certain coal lease payments received by petitioners constitute ordinary income, recovery of capital, or proceeds from the sale of a capital asset. If respondent prevails on this issue, we must determine whether petitioners are liable for the additions to tax under section 6661. This case was submitted fully stipulated pursuant to Rule 122(a). All *198 the stipulated facts are found accordingly. The attached exhibits are incorporated by reference. Petitioner Mary Reinke resided in Center, North Dakota, at the time she filed the petition in this case. [2] For the 1985 taxable year, she filed a joint Federal income tax return with decedent. For the 1986 and 1987 taxable years, she filed individual Federal income tax returns. During the years at issue, Ervin A. Reinke and/or Marion Reinke (hereinafter sometimes referred to as the Reinkes) owned the surface and mineral rights to the southeast quarter of section 26 of a tract of land in Oliver County, North Dakota, and the surface rights only to the southwest and northeast quarters of section 26. The bases in the surface rights to the southeast, southwest, and northeast quarters of section 26 were $ 22,424, *199 $ 21,336, and $ 19,976, respectively. The basis in the mineral rights to the southeast quarter of section 26 was $ 25,411. On August 2, 1961, the Reinkes entered into a coal lease agreement (1961 lease) with Lignite Electric Power Cooperative, Inc. (Lignite Electric), of Bismarck, North Dakota, in respect of the southeast quarter of section 26. The agreement provided in pertinent part as follows: THIS AGREEMENT, made and entered into * * * between Ervin A. Reinke and Marion Reinke * * *, Lessors, Parties of the first part, and Lignite Electric Coop. of Bismarck, North Dakota, Lessees, party of the second part: WITNESSETH, that the Lessors for and in consideration of the rents and royalties, covenants and agreements, hereinafter stated, and by the Lessees to be paid, kept and performed, have granted, demised, leased and let, and by these presents do grant, demise, lease and let unto the Lessees, all that certain real estate situated in Oliver County, North Dakota, more particularly described as follows, to-wit: The Southeast quarter (SE 1/4) of Section Twenty-six (26) * * * together with the appurtenances and rights and privilege to remove any and all lignite coal, and *200 the minerals that are an integral part thereof * * * from said premises by strip mining or otherwise, and to reduce and process the same, together with all the rights and privileges incident to mining and securing said coal * * * IT IS AGREED that this lease shall remain in force for a term of 35 years from the date hereof, and as long thereafter as coal in an amount of not less than ten tons per acre per year of the land herein leased is being mined therefrom * * * IN CONSIDERATION of the premises the said Lessees covenant and agree: 1. To pay the Lessors, as royalty for coal, the sum of ten cents (10 cents) per ton, * * * for all coal removed from said land, and as rental payments and damages for any surface used, occupied or destroyed in the mining and removal of any coal in and underlying lessor's said lands, * * * * * * 4. It is understood and agreed that the royalties and rentals thereinbefore set forth contemplate the ownership by the lessors of 100% of the coal mineral rights therein, but that if the Lessors own a less interest in the above described coal minerals under said land, then the royalties and rentals to be paid as herein provided shall be paid only in the *201 proportion which lessor's interest bears to the whole and undivided ownership thereof.
On December 6, 1968, Lignite Electric assigned its rights under the above lease to Baukol-Noonan, Inc. (BNI). On September 15, 1971, the Reinkes entered into a second coal lease agreement (1971 lease) with BNI in respect of the southwest and northeast quarters of section 26. The contractual provisions of the 1971 agreement were identical to those utilized in the 1961 agreement except that the following language was added to paragraph 4 (presumably in recognition of the fact that the Reinkes either owned or were expected to own less than 100 percent of the mineral rights and perhaps only the surface rights): "PROVIDED, However, that the royalty paid to the lessor herein shall never be less than 2 cents per ton of coal". [3]
On October 3, 1979, the Reinkes entered *202 into an "Agreement With Respect To Surface Use Payments" (surface use agreement) with BNI which clarified BNI's legal and financial obligations under the North Dakota Surface Owners Protection Act, N.D. Cent. Code secs. 38-18-01 to 38-18-08 (1987), [4] in respect of the three leased quarters of section 26. The surface use agreement provided in relevant part: By virtue of the North Dakota Surface Owners Protection Act there has arisen some uncertainties concerning the legal obligations between the parties to this agreement. That is, the act could be construed as requiring BN to pay to the surface owner surface damages for the use of the surface in the course of mining the real property covered by its coal lease, even though BN might not have been obligated to do so at all or to the same extent under the laws pertaining to contracts and real property in existence prior to the enactment of the act. * * * In order to resolve this uncertainty * * * the parties do hereby agree as follows: 1. BN will pay to the surface owner ten cents a ton for every ton of coal actually mined and removed from the property on and after October 1, 1979, with the payments to be made on a monthly basis *203 commencing on November 15, 1979. 2. The surface owner agrees that such payment by BN to him shall constitute all of the payments or damages to which he is entitled by virtue of NDCC 38-18-07(1) and NDCC 38-18-06(5). * * *
On October 3, 1979, the Reinkes executed a Soil Stockpiling Agreement which granted BNI a "lease and license" to store soil from section 26 on land not owned by the Reinkes and to utilize that soil for reclamation purposes on other property so long as an equal amount of soil was respread on section 26 following the strip-mining process. This agreement provided that BNI was "required to reclaim the land which it mines". On May 7, 1982, the Reinkes entered into an *204 agreement with BNI which permitted BNI to "stockpile" coal extracted from the southeast quarter of section 26 under the 1961 lease. [5]
Petitioner received the following amounts from BNI under the coal lease agreements and the surface use agreement in 1985, 1986, and 1987: 1985 1986 1987
Surface/Mineral
$ 175,859
$ 91,519 $ -0-   Stockpiled Coal
-0-  117,432
-0-  Surface Only
75,106
87,525
71,111
Lease Payments
3,245
1,430
1,100
Break of Lease
-0-  7,911
-0-  Payment The foregoing amounts were reported on the Federal income tax returns for 1985, 1986, and 1987, as follows: Year
Capital Gains
Rents and Royalties
1985
$ 254,531
-0-  1986
296,796
$ 9,021
1987
71,431
780
BNI issued Forms 1099 to petitioner for the years at issue which characterized all the 1985 and 1986 *205 payments as "Rents"; the 1987 payment was divided into a "Royalty" component ($ 71,111) and a "Lease" component ($ 1,100). We must determine the correct tax treatment of payments received by petitioner during the years at issue under the 1961 and 1971 leases and the surface use agreement. The parties agree that the "lease payments" and "break of lease payments" constitute ordinary income. They further agree that, insofar as the payments relate to petitioner's ownership of the mineral rights, including the payments for "stockpiled coal", she is entitled to recover her basis in those rights and to treat the excess as capital gain. In this regard, respondent allocated one-half of the surface/mineral payments to petitioner's mineral rights, to which petitioner has raised no objection. Thus, it is with respect to the tax treatment of payments attributable to petitioner's surface rights that the parties disagree. [6]
*206 Petitioner contends that all payments received under the 1961 and 1971 leases and the surface use agreement in respect of her surface rights (hereinafter referred to as surface payments) represent compensation for damages BNI inflicted upon her land in the strip-mining process, and that she is therefore entitled to recover her basis in the land with any excess receiving capital gain treatment. [7] *207 She alternatively contends that the payments represent consideration for: (1) Granting BNI an easement, which constitutes the sale or exchange of a capital asset, or (2) the "exercise of the power of requisition" by BNI in respect of her rights in the surface land. [8] Finally, petitioner maintains that the provisions of the North Dakota Surface Owners Protection Act are inapplicable because that Act was enacted after petitioner and BNI entered into the 1961 and 1971 lease agreements and that, even if the Act applied, its requirements were satisfied by the 1979 surface use agreement.
Respondent counters that petitioner has failed to show that BNI's strip-mining operations permanently damaged her land. Assuming that her land was actually damaged, respondent contends that BNI had a legal obligation to reclaim that land under the North Dakota Surface Owners Protection Act, and that that Act voided any waiver of that obligation, thus negating the 1979 surface use agreement. Insofar as petitioner's first alternative position is concerned, respondent claims that she had a right of reversion in the surface rights; thus, there was no sale or exchange of a capital asset. Finally, respondent contends that the parties never intended the payments to serve as remuneration for damages to petitioner's land. In this respect, respondent directs our attention to *208 the Forms 1099 which characterize payments received under the leases as rental or royalty payments. The burden of proof is on petitioner, Rule 142(a), and that burden is not lessened by the fact that this case was fully stipulated. Borchers v. Commissioner, 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991). At the outset, we note that, insofar as we can determine on the basis of the record before us, the 10-cents-per-ton payment provided for in the 1979 surface use agreement was the same as, and not additional to, the payment provided for in the 1961 and 1971 lease agreements. There is no evidence that the tonnage payments received by petitioner represent more than 10 cents per ton. It was petitioner's burden to show that the 1979 surface use agreement provided for additional payments, if such was the case, and that such payments were in fact received. We first address the issue whether the payments in question were for damages to petitioner's surface rights in the land. In contending that such was the case, petitioner relies upon Inaja Land Co. v. Commissioner, 9 T.C. 727 (1947). *209 In that case, the taxpayer acquired land to be used by its member-shareholders as a private fishing club. Portions of the land were also leased to third parties to graze livestock. Shortly after the land was acquired, The Department of Water and Power of The City of Los Angeles started construction of a tunnel to carry waters diverted from a nearby basin to a point upstream from the taxpayer's land. Once the waters were emptied upstream, they would then flow over and through the taxpayer's land to a point downstream for diversion into the water supply of the City of Los Angeles. Throughout the construction phase, substantial amounts of polluted seepage water escaped from the tunnel onto the taxpayer's land killing its fish and interfering with the members' fishing activities. After the tunnel was completed, the natural flow of waters over and through the taxpayer's land was significantly increased, further damaging the fishing habitat and other portions of the property. The taxpayer having threatened legal proceedings in respect of damages to its property rights, the city agreed to pay $ 50,000 for a release of all past, present, and future claims in respect of such damages. *210 The taxpayer, with an adjusted basis in the property exceeding $ 50,000, treated such payment as a nontaxable return of capital. Respondent determined that $ 48,945 ($ 50,000 - $ 1,085 in attorney's fees) was compensation for the loss of present and future income and, thus, taxable as ordinary income. Based upon an analysis of the agreements and the actions of the taxpayer and the city, we first rejected respondent's contention and concluded that the $ 50,000 payment was to compensate the taxpayer for the conveyance of a right of way and easements as well as for damages to its land. Inaja Land Co. v. Commissioner, 9 T.C. at 735. We then went on to hold that, since it was not possible accurately to calculate the amount of the taxpayer's basis which should be apportioned to those rights and the damaged property, the taxpayer was entitled to treat the payment as a recovery of capital to the extent of its basis in the entire property. Inaja Land Co. v. Commissioner, 9 T.C. at 736. Since the $ 50,000 payment was less than the basis, we had no need to, nor did we, discuss the question whether, if there had been an excess *211 over basis, it would have been entitled to capital gain treatment. In view of the fact that a perpetual easement was involved in Inaja Land, petitioner's reliance on that case as authority for her claim of capital gain treatment for land damage is clearly misplaced. Petitioner's reliance on Inaja Land is further flawed. In that case, we were called upon to choose between alternative characterizations of the payments received. By way of contrast, in this case, we are faced with the question of whether the payments received should be allocated between two characterizations. The 1961 and 1971 lease agreements clearly describe the 10 cents per ton "as royalty * * * and as rental payments" as well as "damages * * * for any surface used, occupied or destroyed". To be sure, the 1979 surface use agreement appears to convert the 10 cents per ton into a damage payment, but we are not persuaded that this agreement was sufficient to obviate the multiple purposes of the originally specified payment and, in effect, confer upon BNI a gratuitous right to enter on the land and mine coal. Petitioner seeks to transpose the Court's unwillingness to allocate basis in Inaja Land *212 into a mandate against making any allocation in order to determine the character of the payments against which the basis might have been applied. We need not go as far as respondent urges so as to require petitioner to show that her surface rights were actually damaged. Although Gilbertz v. United States, 808 F.2d 1374, 1379-1380 (10th Cir. 1987), contains language suggesting that such proof may be required, we think the Court of Appeals did no more than indicate that proof of legally compensable damage was needed. At least for the purposes of this case, we are prepared to assume that strip mining necessarily results in such damage. See Denise Coal Co. v. Commissioner, 271 F.2d 930, 934 (3d Cir. 1959), modifying 29 T.C. 528, 551 (1957); Rochez Bros. v. Duricka, 97 A.2d 825, 826 (Pa. 1953). This is certainly true, during the years in issue, when the North Dakota Surface Owners Protection Act was in effect. In this connection, we note that although petitioner argued that that Act was inapplicable to the 1961 and 1971 leases executed before its enactment, *213 petitioner furnished us with no authority in support of her position, and the fact of the matter is that a recent opinion of the Supreme Court of North Dakota indicates that petitioner's position may well be incorrect. See Knife River Coal Mining Co. v. Neuberger, 466 N.W.2d 606, 608 n.1 (N.D. 1991). Moreover, the 1979 surface use agreement indicates that petitioner and BNI thought that the Act might well be applicable to coal mined subsequent to its enactment. In any event, the assumption that there was damage does not solve petitioner's problem because the record herein is totally lacking any evidence sufficient to permit us to make an estimate of the measure of such damage. Thus, we have no basis for applying the rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). See Norgaard v. Commissioner, 939 F.2d 874, 879 (9th Cir. 1991), affg. in part, revg. in part T.C. Memo. 1989-390. With respect to petitioner's first alternative position, we conclude that she did not grant BNI an easement to use her land. An easement is not a temporary right to use the *214 land of another, as was given BNI in the 1961 and 1971 leases; it is a conveyance of an interest in property. Petitioner had a right of reversion in her surface ownership, which, under the leases, was to take effect at the later of (1) 35 years from the date the lease was executed, or (2) at such time thereafter that BNI ceased mining a minimum of 10 tons of coal per acre a year. Petitioner having retained a reversionary interest in the surface land, there was no "sale or exchange" of property. See Fasken v. Commissioner, 71 T.C. 650, 656 n.3 (1979); Nay v. Commissioner, 19 T.C. 114 (1952). The fact that BNI's use of petitioner's surface land could continue past the original 35-year-lease period does not negate the fact that BNI's rights to use the surface land eventually will revert to petitioner. Vest v. Commissioner, 481 F.2d 238, 245-246 (5th Cir. 1973), affg. on this issue 57 T.C. 128 (1971). Gilbertz v. United States, supra, does not support petitioner's position. In that case, a pipeline company paid the taxpayer for *215 "the right to construct, maintain, inspect, operate, protect, repair, or remove * * * pipeline and appurtenances" necessary to transport oil and other petroleum products across the taxpayer's land. Gilbertz v. United States, 808 F.2d at 1381. The court found that such rights were granted in perpetuity and therefore constituted an easement with the result that there was a sale or exchange of a capital asset. Gilbertz v. United States, 808 F.2d at 1381-1382. Petitioner, contending that the damage occasioned by the laying of pipeline is less severe than that caused by strip mining, maintains that she, like the taxpayer in Gilbertz, is entitled to treat BNI's payments as from the sale of a capital asset. We disagree. The circuit court's decision was premised not, as petitioner seems to conclude, upon the severity of damages; rather, it was based on the finding that the taxpayer granted an easement. Petitioner's second alternative position, that BNI exercised a power of requisition in respect of her surface rights, is totally without merit. The power of requisition, as used in section 1231, refers to the action or *216 threat of action by a governmental body to take a taxpayer's property without consent. See Koziara v. Commissioner, 86 T.C. 999, 1006-1007 (1986), affd. without published opinion 841 F.2d 1126 (6th Cir. 1988). It is clear on this record that petitioner consented to the strip mining. Beyond this, we have no basis for concluding that BNI was a governmental body. Section 6661(a) imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of: (1) 10 percent of the tax required to be shown on the return for a taxable year, or (2) $ 5,000. Sec. 6661(b)(1)(A). The amount of the understatement is reduced by the portion of such understatement which is attributable to: (1) The tax treatment of any item if there is or was substantial authority for such treatment, or (2) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Clearly, petitioner did not disclose the relevant *217 facts; the tax returns merely contained a general description of the item in the manner set forth in our findings of fact. See supra p. 7. This is simply not sufficient disclosure in light of our analysis of Inaja Land Co. v. Commissioner, 9 T.C. 727 (1947), and Gilbertz v. United States, supra.See Accardo v. Commissioner, 942 F.2d 444, 453 (7th Cir. 1991), affg. 94 T.C. 96 (1990); Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987). Nor can we conclude that petitioner had substantial authority to support her position. Petitioner, recognizing the potential weakness of her position on these two elements of section 6661, contends that respondent should have granted her a waiver of the addition to tax under section 6661 on the grounds she: (1) Relied on a licensed attorney to prepare her returns, and (2) is unsophisticated in the complex tax matters involved in the present case and acted reasonably under the circumstances by retaining such attorney to prepare her returns. Section 6661(c) provides that the Secretary may *218 waive all or part of the addition to tax under section 6661 if the taxpayer shows: (1) There was reasonable cause for the understatement, and (2) he acted in good faith. The denial of a waiver by the Secretary is reviewable on an abuse-of-discretion basis. Mailman v. Commissioner, 91 T.C. 1079, 1083-1084 (1988). In determining whether the taxpayer had reasonable cause and acted in good faith, we look primarily to "the extent of the taxpayer's effort to assess * * * [his] proper tax liability under the law." Sec. 1.6661-6(b), Income Tax Regs.; Mailman v. Commissioner, supra at 1084. Reliance upon the advice of an attorney or accountant constitutes a showing of reasonable cause and good faith under section 6661(c) only if, "under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6661-6 (b), Income Tax Regs.
Aside from the fact that the returns for the years at issue show the name of a law firm as the employer of the return preparer, the record is totally devoid of any evidence as to the qualifications or competence of the preparer, the extent to which petitioner relied *219 on that person's advice or that of any other qualified person, or of her own background. Nor has petitioner shown that the preparer was supplied with sufficient information to make an informed judgment about the treatment of the receipts in question. Under these circumstances, we are unwilling to conclude that there was an abuse of discretion in not waiving the section 6661 addition to tax, particularly since there is no indication that a waiver was ever requested. Vorsheck v. Commissioner, 933 F.2d 757 (9th Cir. 1991), and Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), cited by petitioner, were based on factual evidence of reliance by the taxpayers on qualified advisers and are therefore clearly distinguishable. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. For purposes of this proceeding, the Estate of Ervin A. Reinke (decedent), Deceased, Marion Reinke, Personal Representative, and Marion Reinke, individually, shall collectively be referred to as petitioner.↩
3. The record is devoid of any evidence as to the timing of the Reinkes' acquisition or retention of lesser rights or whether they received less than 10 cents a ton.↩
4. The North Dakota Surface Owners Protection Act, enacted in 1975, imposed various legal and financial obligations on mineral developers, such as BNI, designed to protect surface owners from "the undesirable effects of development, without their consent, of minerals underlying their surface". N.D. Cent. Code Sec. 38-18-03↩ (1987).
5. BNI stockpiled coal which had been removed by the strip-mining process but remained unsold. Such coal was placed in a permanent stockpile until sold to the ultimate user, often a utility.↩
6. The parties agree that sec. 631(c), which provides capital gain treatment of proceeds from the disposition of coal by an owner who retains an "economic interest" in such coal, does not apply in respect of this issue.↩
7. In essence, petitioner is claiming that BNI paid her for the right to permanently destroy portions of her land, and, as such, acquired an interest in the surface land in a transaction akin to a sale or exchange, giving rise to capital gain treatment of such payments.↩
8. Sec. 1231(a)(3)(A) provides in part: (A) Section 1231 Gain. -- The term "section 1231 gain" means: * * * (ii) any recognized gain from the compulsory or involuntary conversion (as a result of * * * an exercise of the power of requisition↩ or condemnation or the threat or imminence thereof) * * * [Emphasis added.]