# United States Tax Court

T.C. Memo. 2026-37

CURTIS K. KADAU AND LORI A. KADAU, DECEASED, CURTIS K.
KADAU, PERSONAL REPRESENTATIVE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 286-21.                         Filed May 4, 2026.

————

*Matthew S. Reddington*, for petitioners.

*Dawn L. Danley-Nichols*, *Ryan J. Lonergan*, *John W. Stevens*, *David E. Coe*, *Michael V. Cowan*, *Ryan J. Hough*, and *Thomas A. Deamus*, for respondent.

## MEMORANDUM OPINION

WEILER, *Judge*: On July 31, 2025, we issued our opinion in *Kadau v. Commissioner* (*Kadau I*), T.C. Memo. 2025-81, disposing of most, but not all, of the issues in dispute. In *Kadau I* we refrained from deciding the application of the increased penalty and determining whether the transactions at issue lacked economic substance pending this Court's decision in *Patel v. Commissioner*, Nos. 24344-17, et al., 165 T.C. (Nov. 12, 2025), regarding the Court's position with respect to the application of the increased penalty and the codified economic substance doctrine under section 7701(o).[1] At our invitation, the parties have submitted additional briefing as to application of the increased penalty.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, and Rule

**[\*2]**  In *Kadau I*, T.C. Memo. 2025-81, at \*21, we rejected petitioners' arguments and determined that the payments made by Surface Engineering & Alloy Co., Inc. (Surface Engineering), which it sought to deduct as insurance expenses relating to a microcaptive insurance arrangement, were neither premiums for insurance in the commonly accepted sense nor for federal income tax purposes. *See id.* at \*19–20 (explaining microcaptive insurance arrangements). On the basis of this determination we held that these payments by Surface Engineering made under the microcaptive arrangement were not deductible under section 162. *Kadau I*, T.C. Memo. 2025-81, at \*37. As part of this determination we also found that the contracts issued by two microcaptive insurance companies, Risk & Asset Protection Services, Ltd. (Risk & Asset), and RMC Property & Casualty, Ltd. (RMC Property), were not insurance contracts and that the policies, which we determined required unreasonable premiums, had no legitimate business purpose. *Id.* at \*38.

In *Kadau I* we sustained section 6662(a) accuracy-related penalties as determined in the Notices of Deficiency on the basis of underpayments attributable to substantial understatements of income tax for tax years 2012 through 2017. *Kadau I*, T.C. Memo. 2025-81, at \*45; *see* I.R.C. § 6662(b)(2). In lieu of the 20% accuracy-related penalty respondent has asserted a 40% accuracy-related penalty under section 6662(b)(6) and (i) for tax years 2012 through 2015[2] because the underpayments for those years were attributable to a nondisclosed transaction lacking economic substance. Petitioners argue that the transactions at issue hold economic substance and therefore satisfy the requirements of section 7701(o).

Accordingly, our focus in this Opinion will be the asserted 40% accuracy-related penalties under section 6662(b)(6) and (i) for tax years 2012 through 2015, which are as follows:

---

references are to the Tax Court Rules of Practice and Procedure. Monetary amounts, other than those appearing in tables, are rounded to the nearest dollar.

[2] Before trial respondent conceded application of the 40% accuracy-related penalty under section 6662(i) for tax years 2016 and 2017. On the basis of the Notices of Deficiency Mr. Kadau is liable alone for penalties with respect to tax years 2012 through 2014, and Mr. and Mrs. Kadau are both liable for the penalty for tax year 2015.

[*3]

| Year | Deficiency | Penalty |
|------|-----------|---------|
| 2012 | $135,858 | $54,343 |
| 2013 | 31,371 | 12,236 |
| 2014 | 89,100 | 35,640 |
| 2015 | 180,633 | 72,253 |

In November 2025 this Court issued *Patel*, 165 T.C., slip op. at 25–31, wherein we held, as a matter of first impression, the taxpayers were liable for penalties under the codified economic substance doctrine pursuant to section 6662(a) and (b)(6) by reason of the transactions' at issue lacking economic substance, and the increased rate under section 6662(i). On January 16, 2026, the parties filed supplemental briefs addressing the impact of *Patel* regarding applicable accuracy-related penalties under the codified economic substance doctrine pursuant to section 6662(a) and (b)(6) and the increased rate under section 6662(i) and whether the microcaptive insurance arrangement in *Kadau I* lacked economic substance. Having considered those filings and the record as a whole, we will sustain respondent's determination with respect to the codified economic substance doctrine under section 6662(a) and (b)(6), as well as the increased penalty under section 6662(i).

## *Background*

We adopt the findings of fact set forth in *Kadau I*, T.C. Memo. 2025-81, repeating such facts only as necessary for clarity and convenience.

## *Discussion*

Section 6662(b)(6) applies a 20% accuracy-related penalty to any disallowance of claimed tax benefits by reason of a transaction lacking economic substance within the meaning of section 7701(o). Section 6662(i)(1) increases the penalty to 40% if the underpayment is attributable to a "nondisclosed noneconomic substance transaction." Section 6662(i)(2) defines a "nondisclosed noneconomic substance transaction" as one with respect to which the relevant facts affecting the tax treatment are not adequately disclosed in the return or in a statement attached to the return.

Section 7701(o) codifies the "economic substance" doctrine. *See Patel*, 165 T.C., slip op. at 13. This provision is applicable to "any transaction to which the economic substance doctrine is relevant." I.R.C.

**[\*4]** § 7701(o)(1). The Code provides a conjunctive test whereby a transaction is treated as having economic substance only if (A) the transaction changes in a meaningful way (apart from federal income tax effects) the taxpayer's economic position and (B) the taxpayer has a substantial purpose (apart from federal income tax effects) for entering into the transaction. I.R.C. § 7701(o)(1). The Code further provides that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if [section 7701(o)] had never been enacted." I.R.C. § 7701(o)(5)(C).

In *Patel*, 165 T.C., slip op. at 17, we said "the statute requires a relevancy determination. To put it plainly—the statute says so, right there, on its face." In supplemental briefing petitioners acknowledge:

> As the Court held in Patel III, a threshold determination must be made as to whether the economic substance doctrine is relevant. Because Petitioners formed a small captive insurance company, *Petitioners acknowledge that section 7701(o) is applicable*. The dispositive question is whether Petitioners' transactions satisfy its requirements.

Accordingly, we refrain from addressing any threshold determination issues and proceed directly to examination of the transaction by applying the foregoing elements outlined in section 7701(o)(1).

Petitioners must satisfy both parts of section 7701(o)(1) to prevail because the subparagraphs are written conjunctively, with the first prong (subparagraph (A)) being objective, and the second prong (subparagraph (B)) being subjective. *See Patel*, 165 T.C., slip op. at 14. Failing either prong results in a determination that the transaction at issue lacks economic substance. *Id.*

I.  *Application of Section 7701(o) to the Microcaptive Arrangement*

    A.  *Change in Economic Position*

The initial question is whether the microcaptive arrangement changed the economic position of the taxpayer in a meaningful way, apart from federal income tax effects. *See* I.R.C. § 7701(o)(1)(A); *see also Patel*, 165 T.C., slip op. at 23. "[T]ransactions lack objective economic reality if they 'do not vary[,] control[,] or change the flow of economic benefits.'" *Southgate Master Fund, L.L.C. ex rel. Montgomery Cap. Advisors, LLC v. United States*, 659 F.3d 466, 481 (5th Cir. 2011)

**[\*5]** (alterations in original) (quoting *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 543 (5th Cir. 2009)). "This is an objective inquiry into whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so." *Patel*, 165 T.C., slip op. at 23 (quoting *Southgate Master Fund, L.L.C.*, 659 F.3d at 481). Moreover, "a circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes." *Id.* (quoting *Merryman v. Commissioner*, 873 F.2d 879, 882 (5th Cir. 1989), *aff'g* T.C. Memo. 1988-72).

Petitioners, in supplemental briefing, contend that the

> captive insurance arrangement was driven by economic and operational necessity. Mr. Kadau formed the captive primarily to reduce Surface's insurance costs and to build reserves that could ultimately replace expensive commercial coverage. In evaluating the captive structure, Mr. Kadau also identified additional risks—such as collection risk—that were unavailable or prohibitively expensive in the commercial market. These risks became increasingly significant as Surface rapidly expanded its business and substantially increased revenue in the years preceding the captive's formation.

We find this argument unpersuasive. First, the high costs of insurance premiums are not unique to Mr. Kadau and Surface Engineering. Second, no evidence in the record reflects that Mr. Kadau "identified additional risks" nor that insurance policies for such unidentified risks were "unavailable or prohibitively expensive" from a third-party insurer. Petitioners further contend:

> Before forming the captive, Petitioners obtained a detailed actuarial feasibility study recommending multiple lines of coverage tailored to Surface's specific risk profile. Petitioners relied on that analysis in selecting coverages and premiums over successive years. As reserves increased, Petitioners transitioned coverage from commercial insurers to the captive, including replacing commercial general liability insurance in 2017.

We can only assume petitioners are citing Mr. Rivelle and his actuarial report as the "detailed actuarial feasibility study

[*6] recommending multiple lines of coverage tailored to Surface's specific risk profile." We have already said this actuarial report is suspect, previously noting:

> We have substantial reservations about petitioners' blind reliance. First, reliance on Mr. Rivelle's actuarial report is suspect, as it was prepared in a matter of days and after a single phone call with Mr. Kadau. Mr. Kadau further testified at trial that he did not provide RMC Group or Mr. Rivelle with any documents about Surface Engineering. This alone suggests that actuarial analysis is lacking here, and it is not the first time we have called into question Mr. Rivelle's calculations or lack thereof. *See Royalty Mgmt. Ins. Co. v. Commissioner*, T.C. Memo. 2024-87, at *47 (concluding that Mr. Rivelle's calculations suggested that he failed to perform actuarial analysis).

*Kadau I*, T.C. Memo. 2025-81, at *25. With respect to the statement regarding how "[p]etitioners transitioned coverage from commercial insurers to the captive," we likewise have already rejected this contention:

> Finally, petitioners argue that the premiums for the general liability policy from 2017 to 2018 were actuarily determined because they used premiums set by the commercial carrier that had issued the policy the captive's policy was replacing. Or, as Mr. Bleiweis testified, he "drafted [the] policy using premiums set by [a] commercial carrier." In short, the RMC Group admitted that Mr. Bleiweis copied the numbers from Surface Engineering's previously purchased general liability policy and reused these numbers, without validating or revaluating them, when designing the new 2017 and 2018 policies by Risk & Asset. Mr. Bleiweis, as noted, is not an actuary, and RMC Property did not provide any calculations, communications, or other documents to demonstrate that these 2017 and 2018 premium valuations were actuarily determined beyond Mr. Bleiweis's claim. We determine this copying to lack actuarial review.

*Id.* at *27. After considering petitioners' argument we remain unpersuaded and continue to find Mr. Rivelle's report lacking, and Mr. Kadau's reliance upon said report unreasonable.

**[*7]**    The transactions before us did not result in a meaningful change in economic position with respect to insurance for several reasons. First, we determined that Risk & Asset did not receive any claims from Surface Engineering during the first four years at issue (2012 through mid-2015). *Id.* at *35. The claims filed in 2016 and 2017 were filed exclusively under the Collection Risk policy, which was issued by Risk & Asset (the captive) to Surface Engineering. *Id.* at *15. Mr. Kadau personally determined and assessed all three claims submitted to Risk & Asset, served as the sole payment authorizer, and decided that "there [was] no need for an adjuster," granting payment for each claim in full without an independent adjuster. *Id.* at *36. As we stated then: "If one were to disregard the federal tax benefits, petitioners would have been in the same position economically had they simply put the amounts claimed as premiums in a bank account to be drawn upon in the event of losses." *Id.* at *35.

Additionally, the transactions involving RMC Property, Surface Engineering, and Risk & Asset resulted in a near circular flow of funds after fees resulting in marginal capitalization. *Id.* at *23–24, *30–31. Mr. Kadau chose and paid for policies with unreasonable premiums which had no legitimate business purpose and were not deductible. *Id.* at *38. The total premiums were priced by Mr. Rivelle in his actuarial report, which notably did not analyze Risk & Asset's financial resources or its ability to pay prospective claims. *Id.* at *34. Surface Engineering purchased excess layer policies issued by RMC Property and paid an alleged premium. *Id.* at *23. RMC Property then paid Risk & Asset a purported reinsurance premium under the Reinsurance Agreement. *Id.* The purported premium was equal to the premium paid to RMC Property by Surface Engineering, less a retained 2–2.5% fee. *Id.* In sum, Mr. Kadau never lost control of his money. As we found in *Patel*, 165 T.C., slip op. at 23–24, a circular flow of funds among related entities does not result in a meaningful change to economic position.

Accordingly, the microcaptive arrangement did not meaningfully change the economic position of Surface Engineering, aside from federal tax effects. *See* I.R.C. § 7701(o)(1)(A); *Patel*, 165 T.C., slip op. at 24.

B.    *Substantial Nontax Business Purpose*

While we could end our analysis here, having determined that the microcaptive arrangement fails the first part of the statutory test, we will proceed, for completeness' sake, and determine whether there is a substantial    purpose—apart    from    federal    income    tax    effects—

**[\*8]** for entering into the microcaptive arrangement. *See* I.R.C. § 7701(o)(1)(B); *cf. Mukhi v. Commissioner*, 163 T.C. 150, 162 (2024), *supplementing* 162 T.C. 177 (2024).

In *Patel*, 165 T.C., slip op. at 24, this Court noted that the microcaptives' premiums were targeted to align with maximizing the taxpayers' tax benefits and deductions through the formation of the captives. In reaching this conclusion, this Court noted that (1) the premiums at issue were not actuarially determined, (2) there were comparably cheaper options available on the market, and (3) Dr. Patel sat on both sides of the transactions, doubling as the microcaptive insurance companies' sole customer and founder. *Id.* at 24−25. This Court determined that these facts and circumstances undermined the Patels' claim that they had a "substantial purpose" for the transactions apart from federal income tax effects. *Id.* at 25.

Petitioners argue that the facts at hand differ from those of *Patel*, pointing to Mr. Rivelle's actuarial feasibility study in 2012 as proof that they sought coverage for specific identified risks and that premiums were based on actuarial analysis rather than tax targets. We found this argument unpersuasive when considering Mr. Kadau's reasonable cause defense and likewise find it unpersuasive here.

Here, as in *Patel*, we previously determined that the initial 2012 calculations performed by Mr. Rivelle were not actuarially determined. *Kadau I*, T.C. Memo. 2025-81, at \*24–27. As noted above, the report Mr. Kadau relies upon was prepared in a matter of days and based upon a single questionnaire and one phone call. Mr. Kadau further testified at trial that he did not provide RMC Group or Mr. Rivelle with any documents about Surface Engineering.

Unsurprisingly, we also found that the premiums paid for the captive coverages were significantly higher, between 2.5 and 3.5 times more, than Surface Engineering's commercial policies. *Id.* at \*24, \*35. This was a key factor in determining that the policies developed by Surface Engineering were not arm's length, as an insurance purchaser would want to negotiate lower instead of higher premiums, and here it supports a conclusion that Surface Engineering was motivated to pay higher premiums to increase its corresponding deductions. *Id.* at \*35.

Notwithstanding the facts and circumstances related to the formation of the microcaptive arrangement, other facts indicate the transactions at issue lacked a nontax business purpose. A driving factor in our consideration then, and important to our current analysis now, is

**[\*9]** the $6 million life insurance policy that acted as the larger of only two investments in Risk & Asset's portfolio. *Id.* at *31. The policy represented more than half of Risk & Asset's available funds by 2017 and was specifically chosen in order to cover "all [of Mr. Kadau's] mortgages to protect his family in the event of his death." *Id.* (alteration in original). In addition, the tax-free withdrawals from the annuity, the only other investment in the portfolio, were used to pay the premiums due on the life insurance policy rather than support other investments. *Id.* This created a cyclical flow of funding, leaving the impression that Risk & Asset's investments were nothing more than a structural shell for Mr. Kadau's estate planning rather than effective means of investing premiums to hedge against risk.

For the reasons explained above we conclude that the microcaptive arrangement lacked a substantial purpose apart from federal income tax effects.

II.     *Determination of the Accuracy-Related Penalties*

Having determined that the microcaptive arrangement at issue lacked economic substance within the meaning of section 7701(o), we now further determine whether section 6662(b)(6) and (i) accuracy-related penalties are applicable. However, only one accuracy-related penalty may be imposed for each tax period with respect to any given portion of an underpayment, even if more than one ground set forth in section 6662(b) is applicable. *Patel*, 165 T.C., slip op. at 30. As noted above, in lieu of the 20% penalty, respondent seeks to impose a section 6662(b)(6) accuracy-related penalty of 40% under section 6662(i) for tax periods 2012 through 2015. Section 6662(i) increases the penalty from 20% to 40% for any portion of an underpayment that is attributable to one or more nondisclosed noneconomic substance transactions under section 6662(b)(6). *See Patel*, 165 T.C., slip op. at 28–29; *see also Oropeza v. Commissioner*, 155 T.C. 132, 140 (2020) ("[S]ection 6662(i) does not impose a distinct penalty. It simply increases the rate of the penalty imposed . . . for engaging in a transaction lacking economic substance."). Section 6662(i)(2) explains that "the term 'nondisclosed noneconomic substance transaction' means any portion of a transaction [lacking economic substance] with respect to which the relevant facts affecting the tax treatment are not adequately disclosed in the return nor in a statement attached to the return." *See Patel*, 165 T.C., slip op. at 29.

**[\*10]** The final question before us is whether petitioners are subject to an increased penalty rate under section 6662(i) for taxable years 2012 through 2015. We find that they are.

In *Patel*, 165 T.C., slip op. at 28–30, this Court considered what constitutes adequate disclosure under section 6662(i)(2). In other contexts we have determined that "[a]dequate disclosure is a factual question." *Highwood Partners v. Commissioner*, 133 T.C. 1, 21 (2009) (examining omitted gross income). For a disclosure to be adequate, it "must be sufficiently detailed to alert the Commissioner and his agents as to the nature of the transaction so that the decision as to whether to select the return for audit may be a reasonably informed one." *Patel*, 165 T.C., slip op. at 29 (citing *Estate of Fry v. Commissioner*, 88 T.C. 1020, 1023 (1987)).

Surface Engineering filed its returns on Forms 1120S, U.S. Income Tax Return for an S Corporation, for tax periods 2012 through 2015. However, none of the returns reflects the common connection to Risk & Asset or to RMC Property. Furthermore, each return failed to include Form 8275, Disclosure Statement, an addendum, or even a schedule identifying a connection with the microcaptive arrangement.

We have said that adequate disclosure can be made by a taxpayer providing sufficient information on the return to enable the Commissioner to identify the potential controversy involved. *Estate of Reinke v. Commissioner*, 46 F.3d 760, 765 (8th Cir. 1995), *aff'g* T.C. Memo. 1993-197; *Schirmer v. Commissioner*, 89 T.C. 277, 285–86 (1987). However, the "mere declaration of a deduction does not entitle taxpayer to a reduced penalty." *Accardo v. Commissioner*, 942 F.2d 444, 453 (7th Cir. 1991), *aff'g* 94 T.C. 96 (1990).

Considering the circumstances before us, we determine that petitioners failed to adequately disclose relevant facts or provide sufficient information on their individual returns, and likewise on Surface Engineering's corporate returns, to enable respondent to identify the fact that premiums paid and deducted were part of a microcaptive arrangement.

III.  *Conclusion*

On the basis of the foregoing, we sustain respondent's section 6662(a) and (b)(6) penalties at the increased rate of 40% per section 6662(i) for tax years 2012 through 2015. We also continue to sustain

**[\*11]** respondent's remaining 20% accuracy-related penalties for tax years 2016 and 2017 as determined in *Kadau I*.

In reaching our conclusions, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*