# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 30, 2011

Lyle W. Cayce
Clerk

No. 09-11166

SOUTHGATE MASTER FUND, L.L.C., by and through Montgomery Capital Advisors, LLC its Tax Matters Partner,

> Plaintiff–Appellant–Cross-Appellee

v.

UNITED STATES OF AMERICA,

> Defendant–Appellee–Cross-Appellant

Appeals from the United States District Court
for the Northern District of Texas

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We affirm in all respects the district court's judgment disposing of this petition for a readjustment of partnership tax items under 26 U.S.C. § 6226. The plaintiff, Southgate Master Fund, L.L.C., was formed for the purpose of facilitating the acquisition of a portfolio of Chinese nonperforming loans ("NPLs"). A partnership for tax purposes, Southgate's disposition of its portfolio of NPLs generated more than $1 billion in paper losses, about $200 million of which were claimed as a deduction by one of its partners in tax year 2002. The Internal Revenue Service determined that Southgate was a sham partnership that need not be respected for tax purposes and that Southgate's allocation of the $200 million loss to the deducting partner should be disallowed. The district

court upheld these determinations. After laying out the pertinent factual background in Part I, we explain in Part II why the district court was correct to do so. The Service further determined that the accuracy-related penalties in 26 U.S.C. §§ 6662(b)(1)–(3) applied to the underpayments of tax resulting from Southgate's treatment of its losses. On this point, the district court disagreed, disallowing the accuracy-related penalties on the ground that Southgate had reasonable cause for, and acted in good faith with respect to, the tax positions that resulted in the underpayments of tax. Although this issue is a close one, we affirm the district court's decision to disallow the penalties.

## I. FACTUAL BACKGROUND

At issue on this appeal are the income-tax consequences of three interrelated transactions entered into by Southgate and its three members, D. Andrew Beal, Thomas Montgomery, and China Cinda. As a limited liability company (LLC), Southgate is treated as a partnership for federal-income-tax purposes.[1] The Internal Revenue Code subjects partnerships to pass-through tax treatment. Partnerships do not pay income tax; instead, a partnership's income and losses flow through to its partners.[2] The Southgate partner[3] whose individual income-tax liability will ultimately be affected by this action is Beal.[4]

---

[1] *See* 26 U.S.C. § 761(a).

[2] *Id.* § 701.

[3] Although the co-owners of a limited liability company technically are known as "members," this opinion tracks the language of the Code and refers to Southgate's members as "partners."

[4] A petition for review under § 6226 is a partnership-level proceeding. *See* 26 U.S.C. § 6221. Accordingly, our jurisdiction is limited to determining Southgate's legitimacy as a partnership, whether its claimed losses should be allowed, how those losses (if allowed) should be allocated among its partners, and whether penalties should be imposed. *See id.* § 6226(f); *Petaluma FX Partners, LLC v. Comm'r*, 591 F.3d 694, 653–54 (D.C. Cir. 2010); *Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 547–48 (5th Cir. 2009). Although these determinations likely will affect the tax liability of one or more of the partners, determining the specific tax consequences to an individual partner is beyond the scope of this proceeding. *See generally Jade Trading, LLC ex rel. Ervin v. United States*, 598 F.3d 1372, 1379–80 (Fed.

Beal is a billionaire Dallas banker who has made a name and a fortune for himself as an investor in stressed and distressed debt. Montgomery is a certified public accountant and an associate of Beal's who specializes in locating stressed- and distressed-debt investment opportunities in foreign markets. Cinda is a Chinese-government-owned financial institution. The three transactions in question are the formation of Southgate itself, Southgate's acquisition from Cinda of a portfolio of Chinese NPLs with a face value of about $1.1 billion, and Beal's contribution to Southgate of approximately $180 million worth of Government National Mortgage Association ("GNMA") securities. Summarized here are the relevant facts as found by the district court following a fifteen-day bench trial.

### A. The business plan

Beal is the founder and sole owner of the Beal Financial Corporation and its subsidiary, Beal Bank (collectively, "the Bank"). Beal and the Bank's core business involves identifying and purchasing assets that are undervalued because the market has mispriced their level of risk. Included within this category are NPLs, which are loans as to which the borrowers are in default, are in arrears, or have otherwise failed to perform under the terms of the loan agreement. For years the Bank focused primarily on domestic investment opportunities. But as the domestic market began to price risk more efficiently, Beal and the Bank began to focus on identifying inefficiencies and investment opportunities in foreign markets. In 2001, Beal hired Montgomery to help him identify opportunities to invest in foreign NPLs. Over the next year, Montgomery identified NPL investment opportunities in half a dozen foreign countries. Most notably, in early 2002 Montgomery advised Beal on a purchase of a package of NPLs that were originated in Jamaica. The Bank paid $23 million for the NPLs (approximately five percent of their face value) and

---

Cir. 2010); *Nehrlich v. Comm'r*, 93 T.C.M. (CCH) 1105, at *2 (2007).

ultimately doubled its money on the investment. As the Jamaican NPL transaction was drawing to a close, Montgomery realized that if the transaction had been structured differently, it could have provided substantial income-tax benefits for Beal.

Around the same time that Beal and Montgomery were beginning to look for opportunities to invest in foreign NPLs, a robust market for NPLs was emerging in China. By the late 1990s, China's "big four" state-owned commercial banks had become saddled with huge numbers of NPLs. In an effort to reform and modernize its banks, the Chinese government created four new state-owned asset-management companies to assume and resolve the banks' NPLs. Cinda was one of these four new asset-management companies. The Chinese government required the asset-management companies to purchase the banks' NPLs at face value (that is, outstanding principal plus unpaid accrued interest), notwithstanding the fact that, because the loans were nonperforming, they were worth far less than their face values. From the Chinese government's perspective, the full-value-purchase requirement had the dual benefits of cleaning up the banks' balance sheets and providing the banks with an infusion of capital. In 2000 and 2001, China's big four banks sold approximately $169 billion worth of NPLs to the four asset-management companies. Cinda purchased loans with face values of approximately $45 billion.

The asset-management companies were charged with resolving the loans they had assumed. To that end, the statute that created these companies vested them with a series of so-called "super powers" that were designed to facilitate the companies' ability to resolve and collect on the NPLs. These super powers included the authority to restructure and compromise the loans, the right to pursue litigation against debtors, and the ability to toll the running of the statute of limitations.

As the size of the Chinese asset-management companies' NPL portfolios grew, investment banks and other sophisticated international investors began

to enter the Chinese NPL market. Foreign investors believed that the availability of these new super powers increased the likelihood that value could be realized from Chinese NPLs. In November 2001, China Huarong, another of China's four new asset-management companies, auctioned off some of its NPLs. Goldman Sachs and Morgan Stanley both acquired portfolios of NPLs. Each retained Huarong to service its loans, and the market intelligence was that collections were strong and that the investment banks had enjoyed sizeable returns on their investments.

By early 2002 Montgomery was aware of this market intelligence and had identified the Chinese NPL market as a potential investment opportunity for Beal and the Bank. Over the next several months, Montgomery—acting in his capacity as an employee of the Bank—researched the emerging market in Chinese NPLs. Like many other sophisticated investors, Montgomery quickly became convinced that the market held significant potential for profit. Montgomery had a contact at Deutsche Bank, which had signed a brokerage deal with Cinda that made it Cinda's sourcing agent on all NPL deals. In July 2002, Montgomery's contact put him in touch with a representative from Cinda. Montgomery then began to conduct due diligence on acquiring a portfolio of NPLs from Cinda. Montgomery made several trips to China, where he met with representatives from Cinda and reviewed various NPL portfolios. Montgomery eventually determined that the pricing structure would be more favorable on an investment in unsecured NPLs rather than secured NPLs.

### B. The tax plan

At the same time he was researching the profit potential of an investment in Chinese NPLs, Montgomery also began researching the potential tax benefits that could be created by such an investment. In May of 2002, Deutsche Bank introduced Montgomery to the law firm of De Castro, West, Chodorow, Glickfeld & Nass, Inc. ("De Castro"). Montgomery sought De Castro's advice on how to structure an acquisition of Chinese NPLs so that it would create tax benefits for

Beal. In a series of memoranda that it sent to Montgomery in June and July of 2002, De Castro laid out its plan for such a transaction structure. In short, De Castro proposed to Montgomery that, once he had identified the portfolio of NPLs he was going to recommend that Beal acquire, he form a partnership with Cinda and have Cinda contribute the NPLs to the partnership. By purchasing a portion of Cinda's interest in the partnership to which it had contributed the NPLs instead of purchasing the NPLs directly from Cinda, Beal would be able to generate a paper loss that he could claim as a deduction on his individual tax return.

Understanding why De Castro proposed this structure requires a brief review of the relevant provisions of the Internal Revenue Code and its implementing regulations. The Code treats a taxpayer's sale or other disposition of a piece of property in the ordinary course of his business as a taxable transaction. If the amount realized on the sale is less than the taxpayer's adjusted basis in the property, then the taxpayer is entitled to deduct that loss from his taxable income.[5] "Basis" is the amount that the seller has invested in the property; ordinarily, the taxpayer takes a cost basis in a piece of property equal to the property's purchase price.[6] The amount of the loss is determined by subtracting the taxpayer's adjusted basis in the property from the amount realized on the sale.[7] For example, assume a taxpayer purchases a piece of property for $60 and later sells it for $20. The taxpayer's cost basis is $60, and he has suffered a loss of $40 on the sale; that loss, when incurred in the ordinary course of the taxpayer's business, is deductible against the taxpayer's income. By contrast, if a taxpayer purchases a piece of property for $60 and later sells it for $100, he has realized a gain of $40. He would be required to pay tax on

---

[5] 26 U.S.C. § 165(a), (c)(1).

[6] *See* 26 U.S.C. § 1012(a). *See generally* 26 U.S.C. §§ 1011–1016.

[7] 26 U.S.C. § 1001(a). If the amount realized on the sale exceeds the taxpayer's adjusted basis in the property, then the taxpayer realizes a taxable gain.

that gain. This latter example describes, in the most simplified terms, the structure and tax consequences of the Bank's early 2002 purchase of a portfolio of Jamaican NPLs.

These rules apply to purchases of property. De Castro's plan for the Chinese NPL transaction was designed to take advantage of the fact that different rules apply to sales of partnership interests, with the result that purchasing an interest in a partnership that owns property can offer big tax advantages compared to purchasing the property directly. When a partner acquires an interest in a partnership by contributing property to the partnership, the contribution is generally not a taxable disposition of the property.[8] Instead, the partner's basis in the property transfers, or carries over, to the partnership.[9] The partnership's basis in the transferred property is often referred to as "inside basis," and the partnership has the same inside basis in the property that the partner had before the contribution.[10] If, at the time of the transfer, the property's fair market value is lower than the partner's adjusted basis in the property, the property has a built-in loss.[11] Ordinarily, if a partner transfers property with a built-in loss to the partnership, any loss the partnership incurs when it sells that property must be allocated back to the contributing partner; the other partners cannot share in the loss.[12]

---

[8] 26 U.S.C. § 721(a)–(b).

[9] 26 U.S.C. § 723.

[10] *See* 26 C.F.R. § 1.723-1 ("The basis to the partnership of property contributed to it by a partner is the adjusted basis of such property to the contributing partner at the time of the contribution. . . . [S]uch property has the same basis in the hands of the partnership as it had in the hands of the contributing partner . . . .").

[11] *See* 26 U.S.C. § 704(c)(1)(C) ("[T]he term 'built-in loss' means the excess of the adjusted basis of the property . . . over its fair market value at the time of contribution.").

[12] *See id.* § 704(c)(1)(C)(I); *see also* 26 C.F.R. § 1.704-3(a)(1) ("The purpose of section 704(c) is to prevent the shifting of tax consequences among partners with respect to precontribution gain or loss.").

No. 09-11166

For example, suppose that A and B form a partnership, agreeing to a 50–50 split of profits. B contributes $10 in cash to the partnership, and A contributes built-in-loss property with a fair market value of $10 and in which A's basis is $100. A and B each receive a capital-account credit of $10,[13] and the partnership takes a carryover inside basis in the property of $100. If the partnership later sells the property for $10, the partnership has realized a $90 loss on the sale. Under § 704(c)(1)(C)(ii) of the Internal Revenue Code, the entirety of that $90 loss must be allocated to A.[14]

In this way, the normal operation of § 704(c) ensures that tax value follows book value. In other words, when property is sold for a loss, the sale creates a tax benefit in the form of a deduction. The purpose of § 704(c) is to allocate that benefit to the person who has actually suffered a real economic loss due to the property's diminution in value: the partner who paid $100 for property that is now only worth $10.

A wrinkle arises when the contributing partner sells his partnership interest to a new partner before the partnership sells the property with the built-in loss. In that circumstance, Treasury Regulation 1.704-3(a)(7) requires the built-in loss to be allocated to the partner who purchased the partnership interest in the same manner that it would have been allocated to the contributing partner.[15] This rule enables the benefit of claiming the loss as a tax

---

[13] Capital accounts, which generally reflect a partner's percentage ownership interest in the partnership, are calculated based on the fair market value of the property at the time of the contribution. *See generally* LAURA E. CUNNINGHAM & NOËL B. CUNNINGHAM, THE LOGIC OF SUBCHAPTER K: A CONCEPTUAL GUIDE TO THE TAXATION OF PARTNERSHIPS ch. 4 (4th ed. 2011).

[14] By contrast, if B contributed $100 in cash to the partnership, A contributed property with a fair market value of $100, the property's value declined to $10 post-contribution, and the partnership sold the property for $10, then A and B each would be allocated a distributive share of that $90 loss (here, $45 each). *See* 26 U.S.C. § 704(a)–(b).

[15] 26 C.F.R. § 1.704-3(a)(7).

deduction to be separated and transferred away from the person who suffered the real, economic loss of the property's diminution of value.[16]

To continue with the prior example, suppose that after A and B formed their partnership, A sold her partnership interest to C for $10. If the partnership later sold the property contributed by A for $10, the partnership—whose inside basis in the property is $100—would suffer a loss of $90. Regulation 1.704-3(a)(7) would require that $90 loss to be allocated to C.[17] Thus, even though the transaction was revenue-neutral for C in real economic terms (the partnership sold the property for the same amount of money that C spent to purchase his partnership interest), for tax purposes C has suffered a $90 loss, which C is then eligible to deduct against his other income.[18] By contrast, if C had simply purchased the property directly from A, C would have taken a cost basis of $10, and his later resale of the property for $10 would have been income-tax neutral. The real economic consequences to C of the two transactions are identical. But by running the acquisition through the partnership structure instead of consummating a direct purchase, C receives an income-tax windfall despite not being the party who suffered real economic loss as a result of the property's diminution in value.

This example describes—again in highly simplified terms—the transaction structure that De Castro proposed to Montgomery for Beal's acquisition of a portfolio of Chinese NPLs. Cinda was an ideal partner for such a transaction.

---

[16] At the time that Montgomery was researching an investment in Chinese NPLs, there was no cap on the amount of built-in loss that could be transferred this way. Congress has subsequently amended the Code to impose a $250,000 ceiling on the amount of built-in loss that can be transferred among partners. *See* 26 U.S.C. § 743(d)(1).

[17] *Cf.* 26 C.F.R. § 1.704-3(b)(2) ex. 1(iii) (describing the proper allocation of gain upon a partnership's sale of property with a built-in gain).

[18] The portion of this $90 loss that C would be able to claim as a deduction in any given tax year would be capped at the amount of C's outside basis in the partnership. *See infra* notes 21–22 and accompanying text.

Because the Chinese government had required Cinda to purchase its NPLs at face value, Cinda had a cost basis in its NPLs that far exceeded the loans' fair market value; the NPLs had a huge built-in loss. As a foreign corporation not subject to U.S. income taxation, Cinda was a tax-indifferent party, unable to obtain any economic benefit from claiming the built-in loss as a deduction on an American tax return. If Beal were to purchase the NPLs directly from Cinda, that built-in loss would evaporate, and Beal would take a cost basis in the NPLs equal to their purchase price. If Cinda instead contributed to the NPLs to a partnership and Beal then purchased Cinda's interest in the partnership, the built-in loss would be preserved and transferred to Beal. Any loss realized on the partnership's sale of the NPLs would be allocated to Beal for tax purposes.

### C. The deal

On July 18, 2002, Montgomery, Beal, and attorneys from De Castro participated in a conference call in which Montgomery presented the results of his due diligence and recommended that Beal invest in a portfolio of unsecured Chinese NPLs. The parties also discussed the potential tax benefits to Beal that would result from the partnership-based transaction structure proposed by De Castro. Beal explained on the call that the Bank was not in a position to invest in the NPLs. Montgomery—who up until this time had been acting in his capacity as an employee of the Bank—asked Beal to release him from his obligation to the Bank so that he could continue to pursue the deal in an individual capacity. Beal agreed. He also told Montgomery that he might be interested in pursuing the investment personally, outside of the Bank, and asked Montgomery to come back to him once Montgomery had finalized a deal. That same day, Montgomery formed Montgomery Capital Advisers, LLC ("MCA"), a single-member limited liability company through which Montgomery could continue to pursue an investment in Chinese NPLs.

By late July, Montgomery had settled on a particular portfolio of approximately 24,000 of Cinda's most severely distressed unsecured NPLs. The

loans had a face value of approximately $1.145 billion. Montgomery anticipated that most of the portfolio's actual value would come from the discovery of a few "nuggets" within the pool, loans whose values would prove to be many multiples of their acquisition prices. Based on his experience investing in severely distressed unsecured NPLs in the United States, Montgomery believed that the nuggets would make the portfolio of Chinese NPLs worth, at a minimum, 1–3 percent of its face value. To confirm this belief, Montgomery commissioned Zhongyu, a Chinese valuation firm, to provide a valuation analysis of the NPLs. Zhonguyu was tasked with estimating the total value of the portfolio based on a statistically valid sample of about 35 percent of the loans in the portfolio. Zhongyu was to report its findings to Montgomery by mid-August. MCA also retained the services of Haiwen, a Chinese law firm, to perform legal due diligence—that is, to confirm that the loans were legally valid and enforceable, that Cinda owned the loans, and that Cinda had the ability to transfer the loans to an American entity. This due-diligence report was due by the end of August.

Eager to close the deal, Montgomery decided to move forward with Cinda before he received the results of the two due-diligence reports he had commissioned. On July 31 and August 1, 2002, Montgomery and Cinda consummated a series of five transactions. First, Cinda formed Eastgate, a single-member limited liability company organized under Delaware law. As a wholly owned subsidiary of Cinda, Eastgate was created for the purpose of acting as Cinda's United States investment vehicle for NPL transactions.

Second, Cinda contributed to Eastgate the portfolio of NPLs selected by Montgomery. Cinda contributed the NPLs to Eastgate pursuant to a contribution agreement in which it made a series of warranties and representations stating that Cinda had not written off, compromised, or made a determination of worthlessness as to any of the NPLs.

Third, MCA (Montgomery's single-member LLC) and Eastgate formed and organized Southgate as a limited liability company under Delaware law. Upon

formation, Eastgate contributed the NPLs to Southgate pursuant to a virtually identical contribution agreement. In exchange, Eastgate received a 99 percent ownership interest in Southgate and an initial capital account balance of $19,420,000 (an amount roughly equal to 1.7 percent of the NPLs' face value, which reflected the parties' negotiated determination of the loans' fair market value). Montgomery contributed cash and a promissory note worth $196,162 in exchange for a 1 percent ownership interest in Southgate. Montgomery was appointed as Southgate's sole manager.

Fourth, Montgomery entered into a brokerage agreement with Deutsche Bank. Montgomery agreed to pay Deutsche Bank $50,000 for its services as the exclusive placement agent for Cinda's NPLs. In addition, Montgomery agreed that he would pay an additional fee to Deutsche Bank if and when an investor purchased Cinda's interest in Southgate. The fee, which was tied to the percentage of the face value of the loans in Southgate's portfolio, came to about $8.5 million. Montgomery anticipated that Beal (or some other investor) would satisfy this obligation.

Finally, Southgate and Cinda signed a loan-servicing agreement ("LSA") in which Southgate agreed to pay Cinda 25 percent of net collections in exchange for servicing the NPLs. The LSA was critical to the investment strategy in two respects. First, it reduced the up-front purchase cost of the NPLs. Cinda had initially proposed an acquisition price of between $34.36 million and $40.08 million (that is, between 3 and 3.5 percent of the portfolio's face value). However, Montgomery's due diligence had revealed that Cinda was required to use 99 percent of the acquisition price it received for the NPLs to service the bonds it had used to purchase the loans. But any fees it earned as a loan servicer it was free to retain for its own operations. Montgomery thus was able to negotiate the acquisition price of the NPLs from 3-to-3.5 percent down to 1.7 percent by agreeing to have Southgate enter into an LSA that paid Cinda a more generous fee than it otherwise would have been willing to pay. The second

reason the LSA was critical to Montgomery's business plan was that it increased the likelihood of realizing value on the loan portfolio. By retaining Cinda as its loan servicer, Southgate was able to take advantage of Cinda's statutory super powers, which increased the likelihood of successful collections. And by shifting some of the total value that Cinda would receive in the transaction out of the purchase price and into the LSA's fee structure, Montgomery hoped to incentivize Cinda's efforts to service and collect on the loans.

These transactions positioned Southgate as a tax-friendly investment vehicle. Southgate was holding NPLs with a built-in loss of more than $1.3 billion, all of which was allocable to Cinda.[19] An investor who purchased Cinda's interest in Southgate would step into Cinda's shoes and be positioned to claim the tax losses that Southgate generated as it disposed of the loans in its portfolio for pennies on the dollar. Southgate thus stood to generate more than $1 billion dollars in paper losses, losses that would arguably be of ordinary-income character.[20] To a high-net-worth individual paying a marginal tax rate of 35 percent, the ability to deduct these losses would be of tremendous value.

The final pieces of the deal fell into place over the next month. In mid-August, Zhongyu reported the findings of its valuation analysis to Montgomery. Zhongyu estimated that Southgate's portfolio of NPLs was worth between $44.67 million (3.90 percent of face value) and $111.8 million (9.76 percent of face value). Around the same time, Montgomery traveled to China and got a preliminary report from Haiwen that the NPLs were valid loans. On August 25,

---

[19] The district court found that when Cinda contributed the NPLs to Eastgate, Cinda's basis in the NPLs was equal to their purchase price of $1.380 billion, which included $1.145 billion of unpaid principal and $235 million of accrued but unpaid interest. On appeal, neither party challenges this basis calculation. Southgate's basis in the NPLs was the same as Eastgate's, *see* sources cited *supra* notes 9–10, and Eastgate's basis was the same as Cinda's, *see generally* 26 C.F.R. § 301.7701-3 (providing that certain single-member entities are to be disregarded for tax purposes).

[20] *See generally* 26 U.S.C. § 742(b); *id.* § 751(d); *id.* § 1221(a)(4). We stress that these losses are *arguably* ordinary; we do not judge their proper characterization in this appeal.

2002, Montgomery sent a memo to Beal summarizing the results of his due diligence and enthusiastically recommending that Beal purchase a portion of Cinda/Eastgate's interest in the Southgate partnership. Beal readily agreed to do so. He formed a single-member Delaware LLC, Martel Associates, through which he would invest in Southgate. By the end of the week, Haiwen's final legal due-diligence report came through and confirmed that all but a tiny sliver of the loans in the portfolio were legally enforceable and had not been compromised, written off, or discharged in bankruptcy. On August 30, 2002, Beal paid Cinda $19,407,000 in exchange for 90 percent of Eastgate's interest in Southgate. Beal thus wound up with an 89.1 percent ownership interest, leaving Cinda with a 9.9 percent interest and Montgomery's 1.0 percent share unchanged. Beal also assumed Montgomery's obligations under the brokerage agreement with Deutsche Bank and paid the $8.5 million placement fee.

With the deal papered, the parties turned to developing a collection strategy that would be responsive to both profit- and tax-driven concerns. On the business side, Montgomery and Cinda decided to focus on identifying a small number of loans (between 15 and 25 percent of the portfolio) that held enough profit potential to merit further review. The goal was to focus collection efforts on nuggets that would eventually be identified within this smaller pool. The balance of the portfolio would be packaged into smaller groups and sold off to small Chinese collection firms; the proceeds of the sales would provide Southgate with working capital. Consistent with the three-year term of the LSA between Southgate and Cinda, Montgomery and Cinda decided to aim for resolving about 25 percent of the NPLs in 2002, 50 percent in 2003, and 25 percent in 2004. It just so happened that this collection strategy would create losses in amounts tailored to the amounts of personal income against which Beal sought to claim deductions.

Ultimately, Southgate proved to be a failure as an investment venture. The primary cause of Southgate's poor performance was Cinda's disappointing

performance as a loan servicer. The value of many of the loans that Southgate identified as nuggets derived from the fact that they were backed by a Chinese-government guarantee. Cinda's initial efforts to collect on these loans and enforce the guarantees generated push-back and fallout in China. Political pressure from the Chinese government led to Cinda's repeatedly selling off NPLs that Southgate had identified as high-value nuggets. These sales were in direct breach of both the Southgate Operating Agreement and the LSA and cut the legs from Southgate's business plan. The total net collections on Southgate's NPL portfolio were approximately $10.69 million, far less than Zhongyu's valuation report had projected.

## D. The basis-build

Consistent with the collection strategy developed by Cinda and Montgomery, in late 2002 Southgate sold off approximately 22 percent of the loans in its portfolio. The net recovery on the sales was approximately $2.2 million. Southgate suffered a loss on the sales of approximately $294.9 million, of which $292.8 million was pre-contribution, built-in loss. Since Beal had purchased 90 percent of Cinda's interest in Southgate, 90 percent of that built-in loss was allocable to Beal and available for him to take as a deduction on his 2002 individual tax return.

One final step remained in the tax plan: Beal needed to build his outside basis in Southgate. A partner's "outside basis" is his adjusted basis in his ownership interest in the partnership. When a partner purchases a partnership interest, he generally takes a cost basis in his partnership interest.[21] In other words, his outside basis is equal to the amount he paid to acquire the partnership interest. And while partnership losses are deductible by the individual partners, the amount of allocated partnership loss that a partner can claim as a deduction on his individual tax return is capped at the amount of his

---

[21] *See* 26 C.F.R. § 1.742-1.

outside basis.[22]   If the amount of a partnership loss that is allocable to the partner exceeds his outside basis, the overage remains suspended inside the partnership and can only be claimed if the partner builds his outside basis during a future tax year.  Thus, the fact that some $263.5 million of Southgate's built-in losses were *allocable* to Beal was not enough to make the full value of those losses *deductible* by Beal on his 2002 tax return.  Up until the very end of 2002, Beal's outside basis in Southgate was only about $29.9 million (the roughly $19.4 million he paid for his partnership interest plus about $10.5 million in transaction and operating costs).  To be able to deduct most of the built-in loss that was allocable to him, Beal needed to build his outside basis in Southgate.

This was the purpose of what the parties have dubbed the GNMA basis-build.[23]  In late 2002, Beal owned some GNMAs with a fair market value of approximately $180.6 million.   GNMAs are fixed-rate, mortgage-backed securities.  The GNMAs that Beal owned were platinum securities backed by the full faith and credit of the United States, which guaranteed timely payment of principal and interest.  In late December 2002, Beal nominally contributed the GNMAs to Southgate in an effort to build his outside basis in the partnership.

As relevant here, the GNMA basis-build took place in three steps.  First, Beal contributed the GNMAs to Martel (the single-member LLC through which he had purchased his interest in Southgate).[24]  Second, Martel distributed its

---

[22] *See* 26 U.S.C. § 704(d) ("A partner's distributive share of partnership loss . . . shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred."); *see also Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 542 (5th Cir. 2009) ("Generally, a partner's basis in a partnership is determined by the amount of capital he contributes to the partnership, and when a partnership loses money the partners can only deduct the losses from their taxable income to the extent of their basis in the partnership.").

[23] At oral argument, Southgate readily conceded that Beal's contribution of the GNMAs was primarily a tax-motivated transaction.

[24] Soon thereafter, Martel entered into a repo transaction with UBS PaineWebber Inc., in which Martel, in substance, pledged the GNMAs as collateral for a $162 million secured loan.  Martel transferred the proceeds of this loan to the Bank.  Thus, when the GNMAs were

interest in Southgate to Beal. Beal thereby became an 89.1 percent owner of Southgate. Instead of owning an interest in Southgate through Martel, Beal now owned his interest in Southgate directly. Third, Beal contributed Martel to Southgate. Both Southgate's and Martel's operating agreements were amended to irrevocably appoint Beal as the sole manager of Martel and to reflect Beal's admission as a partner in Southgate, Beal's contribution of Martel to Southgate, and Southgate's admission as a partner in Martel. At the time of its contribution to Southgate, Martel still owned the $180.6 million worth of GNMAs. A partner's contribution of property to a partnership generally increases the partner's outside basis in his partnership interest.[25] As a result, Beal took the position that his contribution of the GNMAs to Southgate had increased his outside basis in Southgate by $180.6 million.

Beal's contribution of the GNMAs to Southgate came with numerous strings attached. Four terms of the amendments to the operating agreements are particularly important for our later analysis of this putative contribution. Three of these terms expressly ensured that the vast majority of the GNMAs' value would be reserved to Beal. First, all of the interest that accrued on the GNMAs after their contribution to Southgate was allocated to Beal. Second, in his capacity as Martel's sole manager, Beal had the absolute right in his sole discretion to cause Martel to distribute to him the GNMAs and/or all payments received with respect to the GNMAs. Beal's exercise of this right would not give rise to an obligation on Southgate's part to make proportionate distributions to

---

contributed to Southgate, Southgate assumed Martel's liability on the loan that the GNMAs secured. Ordinarily a partnership's assumption of a partner's liability causes the partner's outside basis to be reduced by the amount of the liability. *See* 26 U.S.C. § 752(b). However, Martel had distributed the proceeds of the loan to Beal in exchange for Beal's agreeing to personally and unconditionally guarantee the loan, and the district court found that Beal was at risk on the guarantee, *see generally* 26 C.F.R. §§ 1.752-1(a)(1), 1.752-2(b)(1). Beal thus assumed Southgate's liability on the loan, and his outside basis was increased concomitantly. *See* 26 U.S.C. § 752(a).

[25] *See* 26 U.S.C. § 722.

the other two partners. Third, Beal had unconditional rights to direct the use and application of all proceeds from the GNMAs and to direct any and all other matters pertaining to the GNMAs. There was a single provision that, at least theoretically, created a possibility that the other partners might profit from the contribution of the GNMAs. If the GNMAs appreciated in value during the time they were held in Southgate, the gain was to be allocated among Southgate's partners in accordance with their percentage interest in the partnership.

The contribution of the GNMAs, at least in form, brought Beal's outside basis in Southgate up to a total of about $210.5 million. When Southgate filed its 2002 partnership return, it allocated to Beal a loss of approximately $263.5 million. The GNMA basis-build enabled Beal to claim $210.5 million of that loss as a deduction on his 2002 individual tax return.

### E.  Procedural history

The Service issued a final partnership administrative adjustment ("FPAA") to Southgate pertaining to its 2002 partnership return. The FPAA concluded that Southgate was a sham partnership that had been formed solely for the purposes of tax avoidance, determined that Southgate would not be recognized as a partnership for federal-income-tax purposes, disallowed Southgate's claimed losses arising out of its 2002 dispositions of Chinese NPLs, and imposed substantial penalties. Southgate filed a petition for review in federal district court under 26 U.S.C. § 6226(a)(2). The district court issued findings of fact and conclusions of law after presiding over a fifteen-day bench trial. The court upheld the FPAA's disallowance of Southgate's claimed losses on the ground that the Southgate partnership was a sham for tax purposes. However, the court disallowed the imposition of penalties on the ground that Southgate had established reasonable cause and good faith and thus had a complete defense to any accuracy-related penalties. Southgate appeals the former determination; the Government appeals the latter.

18

## II. TAX CONSEQUENCES

This appeal requires us to determine the tax consequences of Southgate's formation, Southgate's acquisition of its portfolio of Chinese NPLs, and the GNMA basis-build. The starting point for our analysis is the cardinal principle of income taxation: a transaction's tax consequences depend on its substance, not its form.[26] This principle "is no schoolboy's rule; it is the cornerstone of sound taxation . . . . 'Tax law deals in economic realities, not legal abstractions.'"[27] This foundational principle finds its voice in the judicial anti-abuse doctrines, which "'prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit."[28] The judicial doctrines empower the federal courts to disregard the claimed tax benefits of a transaction—even a transaction that formally complies with the black-letter provisions of the Code and its implementing regulations—if the taxpayer cannot establish that "what was done, apart from the tax motive, was the thing which the statute intended."[29]

Our disposition of this appeal requires us to make use of three of the judicial doctrines. The first is the economic-substance doctrine. "[T]he law does not permit the taxpayer to reap tax benefits from a transaction that lacks

---

[26] *See, e.g.*, *Freytag v. Comm'r*, 904 F.2d 1011, 1015 (5th Cir. 1990) ("The fundamental premise underlying the Internal Revenue Code is that taxation is based upon a transaction's substance rather than its form."), *aff'd*, 501 U.S. 868 (1991); *see also Arevalo v. Comm'r*, 469 F.3d 436, 439 (5th Cir. 2006) ("The Supreme Court has repeatedly stressed that, in examining transactions for the purpose of determining their tax consequences, substance governs over form." (citing *Frank Lyon Co. v. United States*, 435 U.S. 561, 572–73 (1978))).

[27] *Estate of Weinert v. Comm'r*, 294 F.2d 750, 755 (5th Cir. 1961) (quoting *Comm'r v. Sw. Exploration Co.*, 350 U.S. 308, 315 (1956) (internal ellipsis omitted)); *see also Frank Lyon Co.*, 435 U.S. at 573 ("'In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding.'" (quoting *Helvering v. Lazarus & Co.*, 308 U.S. 252, 255 (1939))).

[28] *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353–54 (Fed. Cir. 2006).

[29] *Gregory v. Helvering*, 293 U.S. 465, 469 (1935).

economic reality."[30]   Thus, "[t]ransactions that have no economic effect other than the creation of income tax losses are shams for tax purposes and will not be recognized."[31]  The second is the sham-partnership doctrine.  A partnership "may be disregarded where it is a sham or unreal . . . [,] a bald and mischievous fiction."[32]  A taxpayer must be able to demonstrate that there was some nontax business purpose for his use of the partnership form.[33]  Finally, the doctrine of substance over form "provides that the tax consequences of a transaction are determined based on the underlying substance of the transaction rather than its legal form."[34]   The substance-over-form doctrine allows a transaction to be recharacterized so that its taxable form corresponds to its economic substance.[35]

In an appeal from a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo.[36]  "Specifically, a district court's characterization of a transaction for tax purposes is a question of law subject to de novo review, but the particular facts from which that characterization is made are reviewed for clear error."[37]  Our de novo application

---

[30] *Coltec*, 454 F.3d at 1355.

[31] *Boynton v. Comm'r*,  649 F.2d 1168, 1172 (5th Cir. Unit B July 1981).

[32] *Moline Props., Inc. v. Comm'r*, 319 U.S. 436, 439 (1943).

[33] *See, e.g.*, *Estate of Strangi v. Comm'r*, 293 F.3d 279, 281–82 (5th Cir. 2002); *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 512–13 (D.C. Cir. 2000).

[34] *Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1325 (Fed. Cir. 2011) (citing *Griffiths v. Helvering*, 308 U.S. 355, 357 (1939)).

[35] *See Blueberry Land Co. v. Comm'r*, 361 F.2d 93, 101 (5th Cir. 1966) ("[C]ourts will, and do, look beyond the superficial formalities of a transaction to determine the proper tax treatment.").

[36] *Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 543 (5th Cir. 2009).

[37] *Duffie v. United States*, 600 F.3d 362, 364 (5th Cir.), *cert. denied*, 131 S. Ct. 355 (2010); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978) ("The general characterization of a transaction for tax purposes is a question of law subject to review."). The Government incorrectly contends that *Merryman v. Comm'r*, 873 F.2d 879 (5th Cir. 1989), establishes that sham-partnership determinations are reviewed only for clear error.

20

of the judicial doctrines to the facts as found by the district court leads us to three conclusions. First, Southgate's acquisition of its portfolio of Chinese NPLs had economic substance. Second, Southgate itself was a sham partnership. This second conclusion finds substantial support in our determination that the GNMA basis-build lacked economic substance. Third, Southgate's acquisition of the NPLs should be recharacterized under the substance-over-form doctrine as a direct sale from Cinda to Beal and Montgomery.

### A. The acquisition of the NPLs had economic substance.

With little difficulty, we affirm the district court's conclusion that Southgate's acquisition of the portfolio of NPLs had economic substance. In *Klamath*, we derived a three-part test for determining whether a transaction has sufficient economic substance to be respected for tax purposes: "whether the transaction (1) has economic substance compelled by business or regulatory realities, (2) is imbued with tax-independent considerations, and (3) is not shaped totally by tax-avoidance features."[38] In other words, the transaction must exhibit objective economic reality, a subjectively genuine business purpose, and some motivation other than tax avoidance. While "these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes,"[39] there is near-total overlap between the

---

*Merryman*'s application of the clearly-erroneous standard of review to the Tax Court's decision in a sham-partnership case was the result of the unusual fact that the petitioning taxpayers "agreed with the law applied by the Tax Court" and challenged only the underlying factual findings. *Id.* at 881. *Merryman* did not unseat the well-established rule in this Circuit that "'legal conclusion[s]' that transactions are shams in substance are reviewed de novo." *Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 780-81 (5th Cir. 2001) (alteration in original) (quoting *Killingsworth v. Comm'r*, 864 F.2d 1214, 1217 (5th Cir. 1989)); *see also id.* at 781 n.1 (considering and rejecting the argument that this Court should review the legal conclusion that a transaction is a sham only for clear error).

[38] *Klamath*, 568 F.3d at 544.

[39] *Id.*; *accord Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006) ("[A] lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's sole motive is tax avoidance.").

latter two factors.[40]  The district court's findings of fact strongly support its conclusion that Southgate's acquisition of the NPLs satisfies the standard announced in *Klamath*.

As to the first *Klamath* factor, transactions lack objective economic reality if they "'do not vary[,] control[,] or change the flow of economic benefits.'"[41]  This is an objective inquiry into whether the transaction either caused real dollars to meaningfully change hands[42] or created a realistic possibility that they would do so.[43] That inquiry must be "conducted from the vantage point of the taxpayer at the time the transactions occurred, rather than with the benefit of hindsight."[44]

Southgate's acquisition of the NPLs readily satisfies the first *Klamath* factor.  The district court found that Southgate and its members entered into the NPL investment with a reasonable possibility of making a profit. That the NPL investment ultimately turned out not to be profitable does not call this finding into question.  The investment failed largely because of Cinda's shortcomings as a loan servicer and interference from the Chinese government.  The district court found that these shortcomings were not foreseeable to Beal and

---

[40] To say that a transaction is shaped totally by tax-avoidance features is, in essence, to say that the transaction is imbued solely with tax-dependent considerations.

[41] *Klamath*, 568 F.3d at 543 (quoting *Higgins v. Smith*, 308 U.S. 473, 476 (1940)); *see also Coltec*, 454 F.3d at1355 ("[T]he objective economic substance inquiry [asks] 'whether the transaction affected the taxpayer's financial position in any way.'" (quoting *Adver & Grapevine Records & Tapes, Inc. v. IRS* (*In re CM Holdings, Inc.*), 301 F.3d 96, 103 (3d Cir. 2002))).

[42] "[A] circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes."  *Merryman*, 873 F.2d at 882.

[43] *Portland Golf Club v. Comm'r*, 497 U.S. 154, 170 n.19 (1990) ("'A transaction has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits.'" (quoting *Gefen v. Comm'r*, 87 T.C. 1471, 1490 (1986))); *accord Coltec*, 454 F.3d at 1356; *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 94 (4th Cir. 1985) (explaining that the inquiry into objective economic substance "requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from tax benefits").

[44] *Smith v. Comm'r*, 937 F.2d 1089, 1096 (6th Cir. 1991).

Montgomery at the time they decided to undertake the investment. In the summer of 2002, the available market intelligence and valuation data strongly indicated that the emerging market in Chinese NPLs held significant profit potential. If Zhongyu's upper-end valuation estimate had proven to be accurate, Beal and Montgomery stood to net upwards of $50 million on their investments.[45] The district court was correct to conclude that Southgate's acquisition of the NPLs had objective economic reality.

The latter two *Klamath* factors ask whether the transaction was motivated solely by tax-avoidance considerations or was imbued with some genuine business purpose. These factors undertake a subjective inquiry into "'whether the taxpayer was motivated by profit to participate in the transaction.'"[46] Tax-avoidance considerations are not wholly prohibited; taxpayers who act with mixed motives, seeking both tax benefits and profits for their businesses, can satisfy the business-purpose test.[47]

Here, too, Southgate's acquisition of the NPLs easily passes muster. The district court found that Southgate and its members acquired the NPLs for legitimate purposes and that they believed they could earn a profit from the NPLs. This is not an instance of a taxpayer's engaging in an exotic, one-off transaction that bears no resemblance to its ordinary business activities. Beal and Montgomery specialize in buying stressed debt. They had previously identified a growth opportunity in foreign NPL markets. As the district court

---

[45] Of course, it turned out that Zhongyu's valuation report had substantially overestimated the NPLs' value, but the district court found that it was reasonable for Southgate to rely on Zhongyu's analysis, and the Government does not contend that this finding was clearly erroneous.

[46] *Dow Chem. Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) (quoting *Illes v. Comm'r*, 982 F.2d 163, 165 (6th Cir. 1992)); *see also In re CM Holdings*, 301 F.3d at 102 n.4 (explaining that the "subjective inquiry" plays the "basic role of evaluating whether the taxpayer had a business reason, apart from tax avoidance, for engaging in the transaction").

[47] *See Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 786 (5th Cir. 2001) (collecting cases).

found, the acquisition of the NPLs fit squarely within Beal and Montgomery's core business. The district court also found that Beal and Montgomery would have done the deal regardless of whether it had any tax benefits. As to Montgomery specifically, the court found that he was not in a position to receive tax benefits from the NPLs. His motives were exclusively profit- and business-driven: to earn money on the deal and develop a marketable expertise in Chinese NPLs that he could use in similar transactions in the future. As to Beal, the court found he acted with mixed motives, investing in Southgate both because it posed profit potential and because it offered potential tax benefits. Under our decision in *Compaq Computer Corp.*,[48] that finding is sufficient for economic-substance purposes.

The Government urges us to conclude that the acquisition of the NPLs lacked economic substance because the district court found only that the transaction had "some profit potential" and such a finding is not sufficient for economic-substance purposes if a transaction's profit potential is insubstantial relative to its expected tax benefits. This argument misfires factually and legally. Factually, the district court made three separate findings that the acquisition of the NPLs had not just a *de minimis* profit potential but a reasonable profit potential. Under *Klamath*, those findings support the conclusion that the acquisition had economic substance.[49] The cases that the Government cites in support of its contrary position present readily distinguishable facts.[50] Legally, the Government would have us conflate our

---

[48] *Id.*

[49] *See Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 545 (5th Cir. 2009) (emphasizing that "the proper focus is on whether the loan transactions presented a reasonable possibility of profit" and concluding that the transaction in question lacked economic substance because "no reasonable possibility of profit existed").

[50] *See Rogers v. United States*, 281 F.3d 1108, 1117–18 (10th Cir. 2002) (distinguishing between the economic-substance doctrine and the substance-over-form doctrine before applying the latter); *Keeler v. Comm'r*, 243 F.3d 1212, 1220 (10th Cir. 2001) (rejecting a

analysis of the acquisition of the NPLs under the economic-substance doctrine with our analysis of the formation of Southgate under the sham-partnership doctrine. The acquisition of the NPLs did not, by itself, generate any tax benefits. It was the funneling of that acquisition through the partnership structure that generated massive deductions for Beal. The fact that an economically substantial transaction comes wrapped in a dubious form is not a reason to disregard the transaction; it is a reason to disregard the form. Once the acquisition of the NPLs is recharacterized as a direct sale,[51] it becomes apparent that the tax benefits it created were not disproportionate to its expected profitability.[52] As a result, we affirm the district court's conclusion that Southgate's acquisition of a portfolio of Chinese NPLs was an economically substantial transaction motived by a genuine business purpose.

### B.  Southgate was a sham partnership.

We are also persuaded that the district court was correct to determine that Southgate was a sham partnership that must be disregarded for federal-income-tax purposes.[53] As the Supreme Court explained in *Comm'r v. Culbertson*,

---

taxpayer's argument that a complicated derivative-trading scheme, which as a whole provided nothing but an illusory opportunity for economic profit, nonetheless had economic substance because individual trades within the scheme sometimes generated profits); *ACM P'ship v. Comm'r*, 157 F.3d 231, 258 & n.52 (3d Cir. 1998) (explaining that the "prospect of a nominal, incidental pre-tax profit" is not enough to support a finding of economic substance where none of the partners "reasonably expected to gain any pretax profit from the transaction"); *Kuper v. Comm'r*, 533 F.2d 152, 159 (5th Cir. 1976) (holding that the form assigned to a set of economically substantial transactions need not be respected where "larger tax objectives . . . ultimately controlled [the] specific form of the transactions").

[51] *See infra* Section II.C.

[52] Indeed, the only reason the sale created any tax benefits at all is that Beal suffered real, out-of-pocket losses because of his participation in the transaction.

[53] Southgate engages in question-begging when it contends that 26 U.S.C. § 704(c) mandated the tax treatment at issue in this appeal. Section 704(c) governs the allocation of losses among partners in a valid partnership. It is silent on the question of when a putative partnership is in fact valid. Here the judicial doctrines step into the breach. Sham-partnership analysis makes it plain that Southgate was not a valid partnership for tax purposes. Neither the text of the statute nor Congress's intent in enacting it compels the

25

whether a partnership will be respected for tax purposes depends on whether "the parties in good faith and acting with a business purpose" genuinely "'intended to join together for the purpose of carrying on the business and sharing in the profits and losses.'"[54] This determination is made in light of all the relevant facts and circumstances, including "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent."[55]

Because so many abusive tax-avoidance schemes are designed to exploit the Code's partnership provisions,[56] our scrutiny of a taxpayer's choice to use the partnership form is especially stringent.[57] We are not compelled to conclude that a partnership must be respected for tax purposes "merely because the taxpayer can point to the existence of some business purpose or objective reality in addition to [the partnership's] tax-avoidance objective.[58] Rather, a taxpayer's

application of partnership tax treatment to an entity that was not a true partnership. Section 704(c) does not control.

[54] *Comm'r v. Culbertson*, 337 U.S. 733, 741–42 (1949) (quoting *Comm'r v. Tower*, 327 U.S. 280, 287 (1946)); *see also ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 513 (D.C. Cir. 2000) (describing the "basic inquiry" as "whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance"); *Scofield v. Davant*, 218 F.2d 486, 489 (5th Cir. 1955) ("[T]he reality vel non of the partnership for tax purposes . . . depends upon whether the partners really and truly intended to join together for the purpose of carrying on a business and sharing in the profits or losses or both.").

[55] *Culbertson*, 337 U.S. at 742.

[56] *See* BORIS I. BITTKER & LAWRENCE LOKKEN, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 86.1.2 (2011); Bradley T. Borden, *The Federal Definition of Tax Partnership*, 43 HOUS. L. REV. 925, 928–29 (2006); Karen C. Burke, *Repairing Inside Basis Adjustments*, 58 TAX LAW. 639, 639 & n.1 (2005).

[57] *See TIFD III-E, Inc. v. United States*, 459 F.3d 220, 232 n.13 (2d Cir. 2006); *ASA Investerings*, 201 F.3d at 513.

[58] *See TIFD III-E*, 459 F.3d at 232.

formation of a partnership must, on balance, display good "common sense from an economic standpoint."[59]

The fact that a partnership's underlying business activities had economic substance does not, standing alone, immunize the partnership from judicial scrutiny.[60] The parties' selection of the partnership form must have been driven by a genuine business purpose.[61] This is not to say that tax considerations cannot play *any* role in the decision to operate as a partnership.[62] It is only to say that tax considerations cannot be the *only* reason for a partnership's formation.[63] If there was not a legitimate, profit-motivated reason to operate as a partnership, then the partnership will be disregarded for tax purposes even if it engaged in transactions that had economic substance.[64]

---

[59] *Boca Investerings P'ship v. United States*, 314 F.3d 625, 631 (D.C. Cir. 2003).

[60] *See TIFD-IIIE*, 459 F.3d at 231 ("The IRS . . . is entitled in rejecting a taxpayer's characterization of an interest to rely on a test less favorable to the taxpayer, even when the interest has economic substance. This alternative test determines the nature of the interest based on a realistic appraisal of the totality of the circumstances.").

[61] *See Merryman v. Comm'r*, 873 F.2d 879, 881 (5th Cir. 1989) ("The issue . . . is not whether the operation of the oil rig had economic substance, but whether the formation of the partnership had such substance. Courts have rejected the form of a transaction even when the underlying activity, as in this case the operation of the oil rig, was not a sham."); *see also Saba P'ship v. Comm'r*, 273 F.3d 1135, 1141 (D.C. Cir. 2003) ("'[T]he absence of a nontax business purpose is fatal' to the argument that the Commissioner should respect an entity for federal tax purposes." (quoting *ASA Investerings*, 201 F.3d at 512)); *Adantech L.L.C. v. Comm'r*, 331 F.3d 972, 980 (D.C. Cir. 2003) (holding that a partnership was a sham even though it was "possible that [its] business could have been profitable"); sources cited *supra* note 33.

[62] As Judge Learned Hand once famously said, "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935).

[63] On this score, it is telling that the great judge uttered his well-known epigram just before disregarding the form of a transaction on the ground that it was a sham devoid of economic substance. *See id.* at 811.

[64] Southgate contends that the proper test of a partnership's legitimacy is an either–or test announced by *Moline Properties v. Comm'r*, 319 U.S. 436 (1943), under which a partnership must be respected for tax purposes if it either was formed for the purpose of carrying on business activity or in fact conducts economically substantial business activity

In this case, an application of *Culberton*'s totality-of-the-facts-and-circumstances test demonstrates that the Southgate partnership was a sham that need not be respected for tax purposes. Montgomery, Beal, and Cinda did not intend to come together to jointly conduct the business of collecting on the NPLs. The structure of the GNMA basis-build underscores their lack of such an intent. The parties also lacked any genuine business purpose for their decision to form Southgate.

### *(1) The lack of an intent to join together*

*Culbertson* directs our attention to the conduct of the parties in execution of the partnership agreement's provisions,[65] and Beal and Montgomery's conduct after Southgate's formation demonstrates that they did not truly intend to join together with Cinda in the present conduct of a business. Concededly, Beal and Montgomery's intent at the time they acquired the NPLs was to conduct the business of realizing value from the loans. But their subsequent conduct discloses no intent to conduct that business as a partnership with Cinda.

Most damning is their response to Cinda's shortcomings as a loan servicer—shortcomings that, as noted above, were the primary cause of Southgate's failure to turn a profit on its NPL portfolio. By late 2003, with the net collection rate on the portfolio languishing at less than 1.1 percent, these shortcomings had become apparent, and Montgomery retained an attorney to help him develop a strategy for improving collections. The attorney wrote a

---

post-formation. We disagree. Southgate's test conflicts with our holding in *Merryman*. *See supra* note 61. As a prior published decision of this Court, *Merryman* binds us, regardless of whether its interpretation of *Moline Properties* was correct. *See Grabowski v. Jackson Cnty. Pub. Defenders Office*, 47 F.3d 1386, 1398–1400 & n.4 (5th Cir. 1995) (Smith, J., concurring in part and dissenting in part). That said, *Merryman* was correctly decided, and it is Southgate who misreads *Moline Properties*. What Southgate "alleges to be a two-pronged inquiry is in fact a unitary test," under which "the existence of formal business activity is a given but the inquiry turns on the existence of a nontax business motive." *ASA Investerings*, 201 F.3d at 512 (citing *Knetsch v. United States*, 364 U.S. 361, 364–66 (1960)).

[65] *See also Merryman*, 873 F.2d at 882–83 (relying on the parties' post-formation conduct as evidence of their intentions at the time they formed the partnership).

letter to Cinda complaining about its servicing efforts. Cinda responded by threatening to disclose the Southgate transaction to the IRS. Montgomery's attorney immediately apologized to Cinda, and he made no further efforts to goad Cinda into improving its performance as the loan servicer.

This sequence of events decisively gives the lie to the notion that Montgomery and Beal intended to jointly conduct a business with Cinda. Without an improved collection rate, Southgate's profit potential was doomed. Cinda's repeated, willful breaches of the LSA and the Southgate Operating Agreement had put Beal and Montgomery to a decision: they could preserve the business but risk the tax benefit, or they could sacrifice the business and preserve the tax benefit. With no hesitation, they charted the latter course. Their decision manifests an unmistakable intent to forgo the joint conduct of a profit-seeking venture.[66]

Beal and Montgomery's outside dealings with Cinda also shine an illuminating light on their intentions within Southgate. In late 2003, around the same time that Cinda's shortcomings as a servicer became so egregious that Montgomery began contemplating legal action, Beal and Montgomery entered into another NPL transaction with Cinda. As the district court delicately put it, "It is unclear why they would return to the same unprofitable NPL trough after their difficulty with Cinda's servicing of the Southgate portfolio, other than the anticipated tax benefits." Armed with first-hand information that a second partnership with Cinda had no chance of being profitable, they nonetheless

---

[66] While this decision is highly relevant to our sham-partnership analysis, it does not undercut our previous conclusion that the initial acquisition of the NPLs had economic substance. It is well settled that the parties' post-formation conduct is a reliable gauge of whether they intended to act as partners. *See* sources cited *supra* notes 55, 65. By contrast, a transaction's economic substance or lack thereof is "evaluated prospectively." *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1375 (Fed. Cir. 2010). "In other words, the transaction is evaluated based on the information available to a prudent investor at the time the taxpayer entered into the transaction, not what may (or may not) have happened later." *Id.*

formed such a partnership. If Beal and Montgomery's intent in forming Southgate had been to jointly conduct a legitimate business, they would not have entered into a second, identically structured partnership with Cinda just as Southgate's legitimate business was foundering.

Cinda's post-formation conduct is similarly incompatible with its status as a Southgate partner. Rather than an intent to join together with Beal and Montgomery to pursue profitable business activity, Cinda's actions exhibit an intent to sabotage and undermine Southgate's efforts to make a profitable business out of servicing and collecting on its portfolio of NPLs. Southgate's plan for turning a profit on the NPLs hinged on identifying a few high-value "nuggets" within the portfolio and collecting on those loans. If Cinda had been acting as a true partner, it would have concentrated its most aggressive collection efforts on these loans. Instead, Cinda repeatedly sold off the NPLs that Southgate had identified as nuggets, deliberately thwarting Southgate's profit potential. Cinda did not execute or abide the partnership agreement as a true partner would have.

In addition, Cinda did not even profess to view Southgate as a true partnership. In its public announcement of the Southgate transaction, Cinda declared that it had completed a "package sale of bad debts." Regulatory approval of the transaction was predicated on Cinda's representation that it would retain a 10 percent interest in Southgate only "symbolically." And from Cinda's perspective, its interest in Southgate was purely symbolic. Cinda had received a $19.42 million capital-account credit when it contributed the NPLs to Southgate. Just one month later, Beal paid Cinda $19.41 million to acquire an interest in Southgate. Although on paper Cinda only sold 90 percent of its interest in Southgate to Beal, in real dollars it received 99.93 percent of the value of its loans.

Cinda also did not participate in major partnership decisions. When Southgate was restructured and its operating agreement amended in connection

with the GNMA basis-build, Cinda did not make an additional, matching capital contribution, sign the restructuring agreement or the amended operating agreement, or receive notice that its interest in Southgate had been diluted. In short, the district court's pertinent findings of fact establish that Cinda, Beal, and Montgomery acted in a manner that was inconsistent with an intent to come together in the joint conduct of business.

### (2) The lack of intent to share profits and losses

In light of *Culbertson*'s identification of "the actual control of income and the purposes for which it is used" as a metric of a partnership's legitimacy, the terms of the GNMA basis-build constitute compelling evidence that Southgate was not a true partnership. Beal reserved for himself total control over all of the income produced by the GNMAs. At the time of their contribution to Southgate, the GNMAs could have provided real economic benefits to the partnership in any of four distinct ways. But the structure of the basis-build transaction ensured that Southgate would never receive any of those benefits.

First, the GNMAs had been used as collateral to obtain a $162 million secured loan from UBS. The loan proceeds were derived from the value of the GNMAs, but Beal did not distribute any of the proceeds to Southgate. Instead, he injected the $162 million back into the Bank as capital. There was no prospect of Southgate's ever receiving any of the loan proceeds.

Second, the GNMAs would attract principal payments as the owners of the mortgages backing the securities made their mortgage payments.[67] These payments, too, were diverted away from Southgate pursuant to Beal's unconditional right to direct the use and application of all proceeds from the GNMAs. The principal payments were used to repay UBS for the secured loan,

---

[67] Unlike the principal payment on a traditional bond, which is received on the bond's maturity date, principal payments on a mortgage-backed security are spread out over the life of the security.

thereby ensuring that the loan remained a self-liquidating transaction. There was no prospect of Southgate's ever receiving any of the principal payments.

Third, the GNMAs bore a fixed annual interest rate of 7 percent. This was a major source of the GNMAs' immediate present value during the time they were held by Southgate. But Southgate's amended operating agreement explicitly provided that all of the interest that accrued on the GNMAs after their contribution to Southgate was allocated to Beal. There was no prospect of Southgate's ever receiving any of the interest income.

Finally, the value of the GNMAs could increase in response to interest-rate fluctuations. In other words, the market price of the GNMAs would necessarily reflect their relative attractiveness vis-a-vis other available investment options. If interest rates were to rise, the GNMAs—with their fixed interest rate of 7 percent—would become relatively less attractive to investors, and their market value would go down. If interest rates were to drop, the GNMAs would become relatively more attractive, and their value would climb. When Beal contributed the GNMAs to Southgate, he agreed that if a drop in interest rates were to cause the GNMAs to gain in value, any post-contribution gain was to be shared among all three Southgate partners.

Thus, there was a prospect that Southgate might receive some economic benefit if GNMAs appreciated in value. But that prospect existed only on paper. In the absence of a realization event, any gain in the value of the GNMAs would not actually redound to the benefit of the partners. As the district court found, Southgate's other partners could share in the gain only "in the event of a sales transaction." But Southgate's amended operating agreement gave Beal the absolute right, in his sole discretion, to determine whether, and if so when, the GNMAs would be sold. If Beal wanted to avoid a sale, he had an absolute right to cause Martel to distribute the GNMAs back to Beal, and such a distribution would not create an obligation on Southgate's part to make corresponding distributions to Montgomery or Cinda. And the district court found that "Beal

never intended to share any potential gains or losses from the GNMAs with the other partners in Southgate."[68]

In light of the vise grip that Beal maintained on all economic benefits flowing from the GNMAs, the district court was correct to conclude that the GNMA basis-build lacked objective economic reality under *Klamath*. Beal reserved for himself all loan proceeds, principal payments, interest income, and built-in gain. He contributed the right to share in any post-contribution gain in the event the GNMAs were sold, but he retained an unconditional right to decide whether to sell the GNMAs in the first place, and he had no intention of selling them. Stripped to its essentials, Beal's putative contribution of the GNMAs was no contribution at all. When an asset is contributed to a partnership that will only benefit the partnership in the event of a sale, on terms and under circumstances that make it beyond unlikely that a sale will occur, with the result that no sale ever occurs and the partnership receives no value from the contribution, the contribution cannot be said to have economic substance.[69]

---

[68] Southgate contends that this conclusion about Beal's intent cannot be treated as a finding of fact because it appeared in the conclusions-of-law section of the district court's findings and conclusions. This argument is without merit. In our review of the results of a bench trial, we are not bound by the labels the district court attaches to its conclusions. Instead, we make an independent determination of whether a particular conclusion is factual or legal in nature. *See, e.g.*, *Turpen v. Mo.-Kan.-Tex. R.R. Co.*, 736 F.2d 1022, 1026 n.5 (5th Cir. 1984) ("We regard this conclusion as a finding of ultimate fact, and we are not bound by the label placed on it by the trial court."). The district court's conclusion that Beal had no intention of allowing the other partners to share in the GNMAs was necessarily a finding of fact. *See, e.g.*, *United States v. Hood*, 615 F.3d 1293, 1299 (10th Cir. 2010) (describing the question of intent as "'the quintessential factual question'" (quoting *United States v. Smith*, 534 F.3d 1211, 1224 (10th Cir. 2008))), *cert. denied*, 131 S. Ct. 1546 (2011); *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 n.3 (5th Cir. 1993) ("[I]ntent is inherently a question of fact which turns on credibility."); *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 437 (3d Cir. 1993) (noting "the fact questions inherent in [the] determination of the intent of the contracting parties").

[69] *Accord TIFD III-E, Inc. v. United States*, 459 F.3d 220, 234–35 (2d Cir. 2006) (disregarding as economically insubstantial a transaction that was deliberately structured to minimize the possibility that two putative partners would earn substantial profits); *Dow Chem. Co. v. United States*, 435 F.3d 594, 603 (6th Cir. 2006) (concluding that a transaction lacked economic substance where it "contained features designed to neutralize the taxpayer's

For present purposes, the economically insubstantial nature of the GNMA basis-build is important primarily because of what it reveals about the intentions of Beal, Montgomery, and Cinda.[70] The *sine qua non* of a partnership is an intent to join together for the purpose of sharing in the profits and losses of a genuine business. Because of the basis-build transaction's structure, the district court found, "Beal personally received all of the potential benefits, and retained all of the risks," associated with the GNMAs. Beal's decision to structure the basis-build as he did, Montgomery's willingness to accede to such one-sided terms, and Cinda's total lack of participation in the transaction are inconsistent with their professed intent to share, as partners, in Southgate's profits and losses.[71]

---

ability to realize . . . gains"); *ASA Investerings*, 201 F.3d at 513–14 (determining that a putative partner's "participation was formal rather than substantive" where the evidence confirmed that it "could make no profit from the transaction"); *Grant v. Comm'r*, 150 F.2d 915, 917 (10th Cir. 1945) (holding that a transfer of property among partners should be disregarded for tax purposes where the transferor partner "continues to manage and control the partnership property and to use, enjoy, and dispose of the economic benefits derived therefrom . . . the same as he did before . . . the formation of the partnership").

[70] Here it matters not whether the GNMA basis-build was entirely without economic substance or actually contained some narrow sliver of economically substantial profit potential. *See TIFD III-E*, 459 F.3d at 232 n.13 (holding that a transaction that passes the economic-substance test "would not necessarily survive *Culbertson*").

[71] Southgate argues that the district court found as fact that the GNMA basis-build had objective economic substance. Southgate's argument is premised wholly on the following statement in ¶ 235 of the district court's findings of fact: "[The GNMA basis-build] had some economic substance, as all of Southgate's partners had a reasonable possibility of profit from the GNMAs after their contribution." This statement cannot be reconciled with the balance of the district court's findings on this issue, which—in addition to the three already quoted—includes findings that Beal's contribution of the GNMAs "was [e]ffectively [i]llusory," that "Beal relinquished nothing of economic value" in the basis-build transaction, that "[f]rom Southgate's perspective there was no economic benefit served by Beal's alleged contribution" of the GNMAs, that because Beal had the "option to distribute [the GNMAs] to himself, to the exclusion of Southgate and its other members, Southgate had only a small possibility of realizing an economic profit" from the basis-build transaction, that "Beal never exercised his option to share any gains from the GNMAs with Southgate's other members," that "Southgate allocated all income from the GNMAs to Beal" and none to Montgomery or Cinda, that "[t]he GNMA transaction did not expand Southgate's equity base," and that "[t]here was no substantive non-tax economic reason for" the basis-build, as "the proffered rationales" for the transaction "do not amount to substantive business purposes." In addition, the court's

No. 09-11166

### *(3) The lack of a business purpose*

Finally, *Culbertson* instructs us to ask whether the partners were "acting with a business purpose" when they made the decision to form the partnership. The district court found that the formation of Southgate was important in six separate respects. Southgate contends that these findings compel us to conclude that Southgate was formed with a genuine business purpose and that the partnership therefore was not a sham. Careful scrutiny of these six findings reveals that they do not demonstrate the existence of a "non-tax need to form [Southgate] in order to take advantage of the potential profits of the [NPL investment]."[72] Southgate was a redundancy, "a meaningless and unnecessary incident"[73] inserted into the chain of entities, transactions, and agreements through which the NPL acquisition took place. Southgate served no function whose accomplishment was not already assured by other means or could not have been equally well assured by alternative, less tax-beneficial means.

First, the district court found that "the establishment of a non-Chinese entity into which non-performing loans were transferred" both "avoided the difficulties of getting approval for a wholly-owned foreign entity in China" and also "allowed for easier conversion of RMB into United States dollars." This purpose had already been accomplished by Cinda's formation of Eastgate, the wholly owned subsidiary organized under Delaware law through which Cinda became a member of Southgate.

---

conclusions of law unequivocally state that the GNMA basis-build "lack[ed] economic substance" because the possibility that Beal would "allow Southgate to profit from the GNMA transaction[,] effectively to his own economic detriment," was simply too remote. Because it is inconsistent with nearly a dozen other factual findings as well as the district court's carefully reasoned conclusions of law, we conclude that the finding contained in ¶ 235 is clearly erroneous.

[72] *See Adantech L.L.C. v. Comm'r*, 331 F.3d 972, 980 (D.C. Cir. 2003).

[73] *Minn. Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938).

Second, and relatedly, the court found that "Montgomery was able to confirm Cinda's title to the NPLs and its authority to transfer them to a United States-based partnership." But Cinda confirmed its title and transfer authority when it contributed the NPLs to Eastgate. The transfer from Eastgate to Southgate did not further effectuate this purpose; Cinda made the same set of representations and warranties in its contribution agreement with Eastgate that Eastgate eventually made in its contribution agreement with Southgate.

Third, the district court found that Montgomery's negotiation of an acquisition price of 1.7 percent "afforded an investor an opportunity to turn a profit," especially when coupled with Cinda's 25 percent collection fee, which "aligned Cinda's interests with Southgate's." But the 1.7 percent acquisition price was not contingent on the formation of Southgate. Cinda would have received a payment in the same amount if the transaction had instead been structured as a direct sale. And Cinda's 25 percent collection fee was a term of the LSA, not a term of the Southgate Operating Agreement.

Indeed, the district court's findings about the effects of the LSA forcefully undercut any claim that Southgate fulfilled a genuine business purpose. The court found that "[t]he LSA allowed Montgomery to achieve the essential benefits of partnering with Cinda," including "retaining Cinda's super powers relating to collections," notwithstanding the fact that "[t]he LSA explicitly disavow[ed] any partnership relationship between Cinda and Southgate arising from that agreement." In light of these findings, what was the purpose of creating a formal partnership? From a tax perspective, the answer is readily at hand. From a business perspective, none appears.

Fourth, the district court found that "Montgomery was able to 'lock-in' all of the loans that met his investment criteria . . . by making the acquisition of all such loans a condition of the transaction." While this was formally true, as a practical matter Southgate was inadequate for this purpose. The district court found that Beal walked out of the August 30, 2002, closing at which he was to

36

acquire an interest in Southgate and refused to go forward with the deal until he received additional assurances about the loans.  Prior to Southgate's formation, Montgomery had obtained a CD-ROM from Cinda that contained a schedule of all the loans in the Southgate portfolio.  Beal was concerned that Montgomery had not done enough to ensure that the portfolio of loans Cinda transferred to Southgate was the same portfolio of loans that Montgomery had identified during his due diligence.  Before he would go forward with the deal, Beal demanded that the Haiwen law firm verify that the portfolio was intact and that Deutsche Bank obtain written confirmation from Cinda that the schedule of loans held by Southgate was identical to the schedule that had previously been provided to Montgomery on the CD-ROM.  It was only after Cinda provided this confirmation that Beal was willing to purchase an interest in Southgate.  The fact that the loans had previously been transferred to Southgate was not sufficient to lock in those loans for later acquisition by an investor.  And even if it had been, the confirmation from Deutsche Bank and verification from Haiwen were equally up to the task.

Fifth, the district court found that "the formation of Southgate enabled Cinda to remove from its books thousands of [NPLs], while retaining a profits and servicing fee interest" and receiving immediate liquidity from an infusion of foreign capital.  Again, while the formation of Southgate was consistent with each of these purposes, it was not necessary to the accomplishment of any of them.  The LSA was adequate to ensure that Cinda retained a servicing-fee interest.  A direct sale of the NPLs would have been just as effective at removing the NPLs from Cinda's books and injecting capital.  And Cinda knew that its profits interest was an empty shell.  Unbeknownst to Beal and Montgomery, Cinda had commissioned a valuation report from Zhongyu around the same time that Zhongyu was preparing a valuation report for Montgomery.  In stark contrast to what it told Montgomery, Zhongyu reported to Cinda that the NPLs were worth between 1.18 and 1.56 percent of face value.  Given that Cinda had

37

negotiated an up-front payment equal to 1.7 percent the loans' face value, the profits interest it retained was so slight as to be nonexistent.

Finally, the district court found that the creation of Southgate enabled Montgomery to "obtain[] representations from Cinda that were critical to determining . . . the NPL investment also potentially had significant United States tax benefits." This finding is, of course, immaterial to our analysis, which trains exclusively on the question whether there was a nontax business purpose that necessitated the partnership's existence.[74] Discerning none, we affirm the district court's holding that Southgate was a sham partnership that must be disregarded for federal-income-tax purposes.[75]

### C. The transaction should be recharacterized as a sale.

Where, as here, "we confront taxpayers who have taken a circuitous route to reach an end more easily accessible by a straightforward path," we look to substance over form and tax the transactions "for what realistically they are."[76]

---

[74] *See supra* notes 61–65, 72 and accompanying text.

[75] Southgate's contention that the district court actually held that Southgate was a valid partnership is patently untenable. Southgate's argument rests on the fact that the district court used the label "Southgate Itself had Economic Substance" to introduce the subsection of its conclusions of law in which it concluded that "the Southgate transaction regarding the Chinese NPLs" had economic substance. The wording of the label is somewhat imprecise, but it is clear from context that the court was referring only to the acquisition of the NPLs, not the parties' use of the partnership form. The court addressed this latter issue in a separate subsection of its conclusions of law (denominated, fittingly enough, "Sham Partnership"), where it held that, "[d]espite [Southgate]'s attempts to imbue the partnership with legitimacy, the Court must conclude it was a sham." Indeed, Southgate elsewhere acknowledges that the district court invalidated the partnership, primarily because of the GNMA basis-build's lack of economic substance. Southgate takes umbrage with this line of reasoning, but it is well settled that if a district court arrives at a correct conclusion of law via faulty or questionable reasoning, we can affirm its holding based on an alternative theory that is supported by the findings of fact. *See Coggin v. Longview Indep. Sch. Dist.*, 337 F.3d 459, 466 n.35 (5th Cir. 2003) (en banc); *Hoyt R. Matise Co. v. Zurn*, 754 F.2d 560, 565 & n.5 (5th Cir. 1985); *Cutliff v. Greyhound Lines, Inc.*, 558 F.2d 803, 807 n.12 (5th Cir. 1977). Our de novo application of the *Culbertson* test moots Southgate's objection to the district court's reasons for concluding that the partnership was a sham.

[76] *Kuper v. Comm'r*, 533 F.2d 152, 153 (5th Cir. 1976); *see also Minn. Tea Co.*, 302 U.S. at 613 ("A given result at the end of a straight path is not made a different result because

38

A court is not bound to accept a taxpayer's formal characterization of a transaction, even a transaction that has economic reality and substance.[77] "'The major purpose of the substance-over-form doctrine is to recharacterize transactions in accordance with their true nature.'"[78]

Because we have concluded that the acquisition of the NPLs had economic substance but that the formal partnership structure through which that acquisition took place was a sham, we are left to determine what transactional form most neatly maps onto the substance of that acquisition. The outcome of our analysis under the substance-over-form doctrine is dictated by the outcomes of our economic-substance and sham-partnership analyses.[79] Beal paid Cinda $19.4 million in exchange for an interest in a portfolio of NPLs. That interest was not properly classified as a partnership interest. It is most naturally classified as an ownership interest. We hold that Southgate's acquisition of the portfolio of NPLs should be recharacterized as a direct sale of those NPLs by Cinda to Beal.[80]

## III. PENALTIES

We also affirm the district's decision to disallow the imposition of any accuracy-related penalties under 26 U.S.C. § 6662. Section 6662 imposes a

---

reached by following a devious path.").

[77] *See Harris v. United States*, 902 F.2d 439, 443 (5th Cir. 1990) ("The IRS . . . may disregard form and recharacterize a transaction by looking to its substance."); *Kuper*, 533 F.2d at 155 ("[T]he incident of taxation depends on the substance rather than the form of the transaction."); *id.* (collecting cases).

[78] *Rogers v. United States*, 281 F.3d 1108, 1115 (10th Cir. 2002) (quoting John P. Warner, *Statutory, Regulatory, and Common Law Anti-Abuse Weapons*, 485 PLI/Tax 883, 889 (2000)).

[79] *See Fidelity Int'l Currency Advisor A Fund, LLC v. United States*, 747 F. Supp. 2d 49, 233 (D. Mass. 2010) ("If a partnership is found to be a sham, the partnership should be disregarded, and the partnership's activities are deemed to be engaged in by one or more of the partners."); *see also* 26 C.F.R. § 1.701-2(b)(1) (same).

[80] Determining the tax consequences to Beal and Montgomery of this sale is beyond the scope of this proceeding. *See supra* note 4.

penalty equal to 20 percent of the portion of any underpayment of tax that is attributable to one or more of the following: negligence, a substantial understatement of income tax, or a substantial valuation misstatement under chapter 1.[81] The valuation-misstatement penalty increases to 40 percent in the case of a gross valuation misstatement.[82] However, § 6664(c)(1) provides that no penalty may be imposed under § 6662 if the taxpayer can show that there was reasonable cause for, and that it acted in good faith with respect to, its underpayment of tax.[83] The district court held that none of the penalties in § 6662 were applicable and, in the alternative, that Southgate had satisfied the requirements of § 6664(c)(1). We find no reversible error in the district court's conclusions that Southgate established the reasonable cause and good faith required by § 6664(c)(1) and therefore has a complete defense to any accuracy-related penalties.[84]

Southgate's § 6664(c)(1) defense is predicated on its reliance on tax opinions issued to it by the De Castro law firm and the accounting firm Coscia Greilich & Company ("CGC"). Both tax opinions concluded that it was more likely than not that the IRS would uphold the Southgate tax positions that are the subject of this appeal. The district court found that Southgate relied on these tax opinions in good faith, and the Government does not challenge that finding on appeal. Therefore, the dispositive question is whether Southgate's reliance on the De Castro and CGC opinions constitutes reasonable cause. This

---

[81] 26 U.S.C. § 6662(b)(1)–(3). The penalties are imposed in the alternative, not cumulatively.

[82] *Id.* § 6662(h)(1).

[83] 26 U.S.C. § 6664(c)(1).

[84] We do not reach the propriety of the district court's determinations that, even in the absence of the § 6664(c)(1) defense, none of the § 6662(b) penalties would have applied.

is a question of fact, so we review the district court's findings only for clear error.[85]

We determine whether a taxpayer acted with reasonable cause on a case-by-case basis, evaluating the totality of the facts and circumstances.[86] "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability."[87]  The Treasury Regulations clarify that reliance on the advice of a tax professional can, but "does not necessarily[,] demonstrate reasonable cause."[88] That advice "must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances."[89]  If a tax advisor's opinion is shown to be "based on unreasonable factual or legal assumptions," that is, "upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true," then the taxpayer's reliance on that opinion does not constitute reasonable cause.[90]  And, of course, if the taxpayer fails to actually follow the advice he receives from a tax professional, the taxpayer cannot rely on that advice to establish reasonable cause.[91]

---

[85] *See, e.g.*, *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 341 (5th Cir. 2010); *see also United States v. Boyle*, 469 U.S. 241, 249 n.8 (1985); *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1381 (Fed. Cir. 2010).

[86] *See* 26 C.F.R. § 1.6664-1(b)(1).  Where, as here, the reasonable-cause defense is asserted in a partnership-level proceeding, we look to the conduct of the partnership's managing partners in evaluating the reasonableness of the partnership's reporting position. *See Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 548 (5th Cir. 2009).

[87] 26 C.F.R. § 1.6664-1(b)(1).

[88] *Id.* § 1.6664-4(b)(1).

[89] *Id.* § 1.6664-4(c)(1)(i).

[90] *Id.* § 1.6664-4(c)(1)(ii).

[91] *See, e.g.*, *InterTAN, Inc. v. Comm'r*, 87 T.C.M. (CCH) 767, 2004 WL 25249, at *15–17, *aff'd*, 117 F. App'x 348 (5th Cir. 2004) (per curiam) (unpublished).

The district court's findings of fact establish that all of the elements of reasonable cause are present in this case. Southgate received comprehensive tax opinions from De Castro, a law firm, and CGC, an accounting firm, both of which the district court found to be qualified tax advisors not burdened by any conflict of interest. The district court also found that Southgate and its members "disclosed all pertinent facts" to De Castro and CGC and that the tax opinions "consider all facts and circumstances, analyze the relevance and persuasiveness of authorities, [and] are not based on unreasonable assumptions." The district court further found that Beal and Southgate "carried out the transactions at issue consistently with the transactional documents and descriptions in the De Castro and CGC opinions." Consequently, the court concluded that "the De Castro and CGC opinions met the standards for reliance on tax advice" described in § 6664 and its implementing regulations and that "[i]t was therefore reasonable for Beal and Southgate to rely on the De Castro and CGC opinions."

The Government advances two theories as to why these findings are not sufficient to establish reasonable cause. Neither holds water. First, the Government argues that Beal failed to follow the advice he received from De Castro and CGC when he structured the GNMA basis-build. The record belies this claim. Both opinions accurately describe the structure of the GNMA basis-build; they do not assume, for example, that Beal would share the interest proceeds with the other partners. It is true that in prior correspondence, De Castro had laid out several alternative structures for the basis-build and suggested that these alternatives were more likely to withstand scrutiny from the IRS. But a taxpayer is free to select among "any of the bona fide alternatives developed by a tax advisor acquainted with the relevant facts."[92] Both De Castro and CGC unequivocally concluded that, even in light of the structure that Beal had chosen, it was more likely than not that the IRS would uphold the GNMA

---

[92] *Streber v. Comm'r*, 138 F.3d. 216, 221 (5th Cir. 1998).

basis-build.  In light of these facts, the district court's finding that Beal carried out the GNMA basis-build consistently with the advice he received from his tax advisors is not clearly erroneous.

Next, the Government argues that the district court did not find that the De Castro and CGC opinions were not based on any representations or assumptions that Beal and Montgomery knew, or had reason to know, were unlikely to be true.  The Government is correct that the district court's findings that the tax opinions were not based on any "representations or assumptions that [De Castro and CGC] knew or had reason to know were inaccurate" are immaterial to our reasonable-cause determination.  Our focus is on the taxpayer's knowledge, not the tax advisor's.  But the district court separately found that the tax opinions were not based on any unreasonable assumptions. That finding satisfies the requirement of Regulation 1.6664-4(c)(1)(ii).

The Government's brief contention that this finding was clearly erroneous finds no purchase.  The opinions accurately describe the factual underpinnings of Beal and Montgomery's decision to invest in Chinese NPLs, their reasons for forming Southgate, and the structure of and justifications for the GNMA basis-build.  For example, the opinions attribute several business purposes to the decision to use the partnership structure to invest in the NPLs.  These are the same business purposes that the district court found did, in fact, motivate the formation of Southgate.[93]  Our conclusion that these business purposes were not sufficient to imbue the partnership with legitimacy for tax purposes does not call into question the accuracy with which Beal and Montgomery reported the relevant facts to De Castro and CGC.  Regulation 1.6664-4(c) does not require

---

[93] *See supra* Subsection II.B(3).

the taxpayer to correctly anticipate the legal consequences that the IRS or the courts will attach to the facts underlying a transaction.[94]

## IV. CONCLUSION

The district court correctly held that, while Beal and Montgomery's acquisition of an interest in a portfolio of Chinese NPLs had economic substance, the Southgate partnership was a sham that must be disregarded for federal-income-tax purposes.     As a consequence, that acquisition must be recharacterized as a direct sale.   The court was also correct to disallow all accuracy-related penalties on the ground that Southgate had reasonable cause for, and exhibited good faith in, reporting the positions it took on its 2002 partnership return.  The judgment below is

AFFIRMED.

---

[94] The Government correctly notes that the district court erred in its conclusions of law by determining that penalties were not justified because Southgate's tax advisors "relied on a literal–if narrow–reading of the law and congressional intent" and that Southgate made "assiduous efforts to comply with black-letter law."  If the De Castro and CGC opinions had taken such a hypertechnical view of what a taxpayer must do to discharge its obligations under the Code, reliance on those opinions would have been unreasonable. *See supra* note 89 and accompanying text.  But both opinions discussed and applied the judicial doctrines and the Treasury's anti-abuse regulations.   The court's findings of fact amply support its reasonable-cause determination.